SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, OR 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914-1323 | Phone
brown@westernlaw.org

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, and CASCADIA WILDLANDS, <br><br>*Plaintiffs,* <br><br>vs. <br><br>UNITED STATES FISH AND WILDLIFE SERVICE, and UNITED STATES BUREAU OF LAND MANAGEMENT, <br>*Defendants.* | Civ. Case No. 1:20-cv-00952-AA <br><br>**FIRST AMENDED COMPLAINT** <br><br>(Violations of the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*; and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*) |

PAGE 1 – FIRST AMENDED COMPLAINT

## INTRODUCTION

1.       This is a civil action against the U.S. Fish and Wildlife Service ("FWS") and the U.S. Bureau of Land Management ("BLM"). Plaintiffs allege FWS violated the Endangered Species Act ("ESA") when it issued a Biological Opinion ("BiOp") finding BLM's Poor Windy and Evans Creek timber sales on the Medford District in Oregon were not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of northern spotted owl critical habitat, and concluded it was unnecessary to authorize any incidental take of northern spotted owl. Plaintiffs allege in this amended complaint that BLM and FWS violated the ESA by failing to reinitiate consultation to reconsider the effects of the Poor Windy and Evans Creek timber sales in light of 2019 wildfires in the project areas.

2.       In 2019, BLM and FWS engaged in formal consultation on the Medford District BLM's Fiscal Year 2019 Batch of Projects, pursuant to Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2). On August 7, 2019, FWS transmitted its BiOp on this batch of timber sales, which is comprised of the Medford District's Poor Windy and Evans Creek timber sales ("FY 2019 BiOp").

3.       Combined, the Poor Windy and Evans Creek timber sales authorize timber harvest and fuel reduction maintenance on approximately 17,908 acres of BLM-administered land in southwest Oregon. Of the 17,908 total acres treated, the timber sales will affect 14,245 acres of northern spotted owl habitat, and an additional 1,603 acres of capable northern spotted owl habitat.

4.       Despite the timber sales' extensive adverse effects to northern spotted owls and designated critical habitat, FWS concluded that the timber sales were not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat, and that the timber sales would result in no incidental take of northern spotted owl.

5.       Plaintiffs are bringing this action because FWS has approved two large-scale BLM logging projects that specifically target spotted owl habitat in forests that FWS has deemed "critical" to the

survival and recovery of the species. These timber sales are authorized at a time when northern spotted owl populations are plummeting and the threat of competition from the invasive barred owl has reduced spotted owl reproduction to record low levels. FWS's decision to allow extensive removal of suitable habitat critical to the survival of the species will increase the competitive advantage of encroaching barred owls and undermines spotted owl recovery goals developed by the Service. The agency's reliance on a future, hypothetical, unfunded, and unproven permanent barred owl removal program to mitigate the certain loss of spotted owl habitat is unlawful.

6.      On May 29, 2020, Plaintiffs notified FWS and BLM that the agencies are required to reinitiate consultation under Section 7(a)(2) of the ESA, in order to consider new information, concerning 2019 forest fires, revealing effects of the action in a manner and to an extent not considered in the FY 2019 BiOp, pursuant to 50 C.F.R. § 402.16(a)(2).

7.      On July 17, 2020, FWS and BLM responded to Plaintiffs' notice letter, asserting the agencies' position that reinitiation of formal consultation is not required.

8.      The 60 day notice period, required before commencing suit for this failure under 16 U.S.C. § 1540(g)(2), concluded on July 28, 2020. FWS and BLM have not reinitiated formal consultation concerning the Poor Windy and Evans Creek timber sales, as required by law. Plaintiffs therefore file this amended complaint in order to challenge, and seek redress for, this additional violation of the ESA by FWS and BLM.

## JURISDICTION

9.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question). The causes of action arise under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*; and the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*. The FY 2019 BiOp constitutes final agency action subject to immediate judicial review. 5 U.S.C. § 704; *Bennett v. Spear*,

520 U.S. 176, 178 (1997). The requested relief is proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706. An actual, justiciable controversy exists between Plaintiffs and Defendants.

## VENUE

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are federal agencies of the United States government and all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and all Plaintiffs have their principal places of business within this District.

11.     Divisional venue is proper in this Court pursuant to Local Rule 3-2(a), because the FY 2019 BiOp concerns the Medford District BLM's 2019 batch of timber sales, a substantial portion of the Poor Windy timber sale area is in Josephine County, and all or most of the Evans Creek timber sale area is in Jackson County.

## PARTIES

12.     Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a domestic non-profit corporation organized and existing under the laws of the State of Oregon. KS Wild's primary office is in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members concentrated in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath-Siskiyou region. KS Wild is a leader in protecting Oregon's public lands and forests, and routinely participates in monitoring and commenting on and challenging in court

actions affecting public lands in Oregon. KS Wild is a membership organization and has members who would be irreparably injured by the Poor Windy and Evans Creek timber sales.

13.     Plaintiff CASCADIA WILDLANDS is an Oregon non-profit organization based in Eugene, Oregon and with additional offices in Roseburg, Oregon and Cordova, Alaska. Representing over 6,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. Cascadia Wildlands' members use the Poor Windy and Evans Creek timber sale areas for a variety of professional and personal pursuits including viewing threatened and endangered species. Implementation of these timber sales would irreparably harm the interests of Cascadia Wildlands and its members.

14.     Plaintiff OREGON WILD is a non-profit corporation with approximately 7,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy. Oregon Wild members use the Poor Windy and Evans Creek timber sale areas for hiking, recreation, bird watching, nature appreciation, and other recreational and professional pursuits. Implementation of these timber sales would irreparably harm the interests of Oregon Wild and its members.

15.     Defendant U.S. FISH AND WILDLIFE SERVICE is an agency of the U.S. Government within the U.S. Department of the Interior. The U.S. Fish and Wildlife Service is charged with the management of fish, wildlife, and natural habitats.

16.     Defendant U.S. BUREAU OF LAND MANAGEMENT is an agency of the U.S. Government within the U.S. Department of the Interior. The U.S. Bureau of Land Management is charged with the management of the nation's federal public lands.

PAGE 5 – FIRST AMENDED COMPLAINT

## LEGAL AND FACTUAL BACKGROUND

**The Administrative Procedure Act**

17.     The Administrative Procedure Act (APA) provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

18.     Final agency actions are reviewable under the APA. 5 U.S.C. § 704. A BiOp is a "final agency action" within the meaning of the APA. *Bennett v. Spear*, 520 U.S. 176, 178 (1997).

19.     Under the APA, a reviewing court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

20.     An agency's decision is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010).

**The Endangered Species Act**

21.     Congress enacted the Endangered Species Act (ESA) in 1973 in order "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

22.     Congress further declared its policy that all federal agencies "shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance" of the ESA's purposes. 16 U.S.C. § 1531(c).

23.     Section 4 of the Endangered Species Act requires FWS to "designate any habitat" of a listed species that is "considered to be critical habitat." 16 U.S.C. § 1533(a)(3). The ESA defines critical habitat as "the specific areas within the geographical area occupied by the species, at the time it is listed[,] … on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection … ." 16 U.S.C. § 1532(5)(A)(i).

24.     Section 4 of the ESA also directs FWS to develop and implement "recovery plans … for the conservation and survival" of listed species and incorporate "a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species … ." 16 U.S.C. §§ 1533(f)(1) & 1533(f)(1)(B)(i).

25.     Section 7 of the Endangered Species Act requires every federal agency, in consultation with FWS, to insure that its actions are "not likely to jeopardize the continued existence of any endangered … or threatened species or result in the destruction or adverse modification of" a listed species' critical habitat 16 U.S.C. § 1536(a)(2). The result of consultation is a biological opinion ("BiOp"), which concludes with a determination that an action either is likely or is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(b).

26.     If FWS concludes in the BiOp that an action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, it must issue an "incidental take statement" specifying a limited number of individuals that may be incidentally taken. 15 U.S.C. § 1536(b)(4).

27.     The Secretary of Interior and the Secretary of Commerce co-administer the ESA and have delegated the authority to implement the ESA to FWS and the National Marine Fisheries Service, respectively. 16 U.S.C. § 1536(15).

28.     The ESA's implementing regulations were amended on August 27, 2019, after the FY 2019

BiOp was prepared and transmitted. 84 Fed. Reg. 45,016 (Aug. 27, 2019). These regulations are the

subject of ongoing litigation. *See Ctr. for Biological Diversity v. Bernhardt*, No. 19-05206-JST (N.D. Cal.

May 18, 2020); *California v. Bernhardt*, No. 19-0613-JST, 2020 WL 3097091 (N.D. Cal. May 18, 2020);

*Animal Legal Defense Fund v. Bernhardt*, No. 19-06812-JST (N.D. Cal. May 18, 2020).

29.     Reinitiation of formal consultation under Section 7 of the ESA "is required and shall be

requested by the Federal agency or by the Service, where discretionary Federal involvement or

control over the action has been retained or is authorized by law and: (1) If the amount or extent of

taking specified in the incidental take statement is exceeded; (2) If new information reveals effects of

the action that may affect listed species or critical habitat in a manner or to an extent not previously

considered; (3) If the identified action is subsequently modified in a manner that causes an effect to

the listed species or critical habitat that was not considered in the biological opinion …; or (4) If a

new species is listed or critical habitat designated that may be affected by the identified action." 50

C.F.R. § 402.16(a).

30.     At the time FWS consulted on the Poor Windy and Evans Creek timber sales, it defined

"jeopardize the continued existence of" as meaning "to engage in an action that reasonably would be

expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and

recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that

species." 51 Fed. Reg. 19,926, 19,958 (June 3, 1986), *formerly codified at* 50 C.F.R. § 402.02.

31.     At the time FWS consulted on the Poor Windy and Evans Creek timber sales, it defined

"destruction or adverse modification" as meaning "a direct or indirect alteration that appreciably

diminishes the value of critical habitat for the conservation of a listed species." 81 Fed. Reg. 7,214,

7,226 (Feb. 11, 2016), *formerly codified at* 50 C.F.R. § 402.02. At the time it issued the FY 2019 BiOp,

FWS interpreted "appreciably diminish the value" of critical habitat as meaning "to considerably

reduce the capability of designated or proposed critical habitat to satisfy requirements essential to both the survival and recovery of a listed species." 81 Fed. Reg. 7,218.

**Federal Land Policy and Management Act**

32.    Congress enacted the Federal Land Policy and Management Act (FLPMA) in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 et seq.

33.    Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). Furthermore, Congress expressed its belief that our public land should "be managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

34.    FLPMA requires BLM to develop land use plans, called "resource management plans" ("RMP"), that govern the use of the land it manages. 43 U.S.C. § 1712. Once a land use plan has been developed, BLM is required to manage its lands in compliance with the plan. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

35.    BLM issued a RMP for Southwestern Oregon, including the Medford District, in 2016. ("2016 RMP"). The 2016 RMP governs the Poor Windy and Evans Creek timber sales. FWS prepared a BiOp for the 2016 RMP in 2016 ("2016 RMP BiOp").

**The Northern Spotted Owl** (*Strix occidentalis caurina*)

36.    The northern spotted owl is a medium-sized dark brown owl, with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks.

37.    The northern spotted owl is one of the most studied birds in the world.

38.    The northern spotted owl occupies late-successional and old-growth forest habitat in the Pacific Northwest, from southern British Columbia as far south as Marin County, California.

39.     Northern spotted owls rely on older forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. Forested stands with high canopy closure also provide thermal cover and protection from predation. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat.

40.     Northern spotted owls also require habitat to disperse to new territories. Dispersal habitat may include younger and less diverse forest stands than foraging habitat, such as even-aged, pole-sized stands, but such stands should contain some roosting structures and foraging habitat to allow for temporary resting and feeding for dispersing juvenile owls. Dispersal habitat is essential to maintaining stable populations of owls by filling territorial vacancies when resident northern spotted owls die or leave their territories, and to providing adequate gene flow across the range of the species. Dispersal habitat, at a minimum, consists of stands with adequate tree size and canopy closure to provide protection from avian predators and at least minimal foraging opportunities.

41.     While northern spotted owls are capable of dispersing across landscapes with relatively large openings, the best available science suggests the probability of successful dispersal is highest in mature and old growth forest stands characteristic of NRF habitat, where there is more likely to be adequate cover and food supply.

42.     In southwest Oregon, dusky-footed wood rats and flying squirrels are a primary prey species for northern spotted owls. Small mammals such as red tree voles, deer mice and red-backed voles along with birds and insects comprise a smaller proportion of overall diet for northern spotted owls in southwest Oregon. Woodrats are abundant in old growth and complex forests, but are also found

in high densities in early-seral or edge habitat. Flying squirrels are most abundant in classic multi-layered old growth forest, but are also found in high-stem-density closed-canopy forest.

43.    Spotted owl occupancy of a territory is determined based on a series of protocol surveys that take place over a period of two years. *See* FWS, Protocol for Surveying Proposed Management Activities that may Impact Northern Spotted Owls (Feb. 7, 2011; revised Jan. 9, 2012).

44.    The probability of occupancy is increased when core areas contain a range of habitat conditions suitable for use by spotted owls, and the survival and fitness of spotted owls is positively correlated with larger patch sizes or proportion of older forests. Franklin et al. (2000, p. 573); Dugger et al. (2005, p. 876). Depending on the availability of habitat, fitness may be compromised when additional habitat losses occur. Habitat-fitness and landscape models have demonstrated the importance of having sufficient amounts of NRF habitat within core use areas to adequately provide for spotted owl survival and reproduction, along with access to prey. Survival of northern spotted owl in the Oregon Klamath Province is negatively correlated with forest fragmentation. Shilling et al. (2013, p. 12).

45.    Barred owls (*Strix varia*) are native to North America, but only recently arrived in the West. Barred owls are slightly larger and more aggressive than spotted owls, and compete for the same habitat and prey, although barred owls use a wider range of habitat types and prey on a wider range of prey species.

46.    Due to concerns over its widespread habitat loss and habitat modification, and the lack of regulatory mechanisms to protect the species, FWS listed the northern spotted owl as a Threatened species under the Endangered Species Act on June 26, 1990. Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (*codified at* 50 C.F.R. § 17.11(h)).

47.    ///

48.    ///

**Northern Spotted Owl Recovery Plan**

49.     FWS first published a recovery plan for northern spotted owl in 2008, and last revised it in 2011. Endangered and Threatened Wildlife and Plants; Revised Recovery Plan for the Northern Spotted Owl, 76 Fed. Reg. 38,575 (July 1, 2011) (Notice of document availability) ("Recovery Plan").

50.     According to the Recovery Plan, not only is "managing sufficient habitat for the spotted owl now and into the future is important for its recovery," but also "… [b]ased on the best available scientific information, competition from the barred owl … poses a significant and complex threat to the spotted owl."

51.     The Recovery Plan contains "Recovery Actions," that are necessary to conserve and recover the northern spotted owl.

52.     Recovery Action 10 requires agencies to "[c]onserve spotted owl sites and high value spotted owl habitat to provide additional demographic support to the spotted owl population." Recovery Plan III-43.

53.     Recovery Action 32 states that "[b]ecause spotted owl recovery requires well distributed, older and more structurally complex multi-layered conifer forests on Federal and non-federal lands across its range, land managers should work with the Service … to maintain and restore such habitat … . These high-quality spotted owl habitat stands are characterized as having large diameter trees, high amounts of canopy cover, and decadence components such as broken-topped live trees, mistletoe, cavities, large snags, and fallen trees." Recovery Plan III-67.

54.     Recovery Action 32 is justified at several scales and is supported by the best available science. The Recovery Plan states that "[t]his recovery action may be temporary in nature, until such time as the competitive pressures of the barred owl on the spotted owl can be reduced to an extent that retention of these stands or patches is not necessary for spotted owl recovery." Until that time,

however, retention of high-quality spotted owl habitat is essential to the recovery of the species. Recovery Plan III-68.

55.     The Recovery Plan concludes that, "[b]ecause spotted owls on established territories are likely to be more successful if they remain in those locations (Franklin et al. 2000), managing to retain spotted owls at existing sites should … the highest priority for land managers." Recovery Plan III-43.

**Northern Spotted Owl Critical Habitat**

56.     Critical habitat was first designated for the northern spotted owl in 1992, and last revised in 2012. Endangered and Threatened Wildlife and Plants; Revised Critical Habitat for the Northern Spotted Owl: Final Rule, 77 Fed. Reg. 71,876 (December 4, 2012) ("Critical Habitat Rule").

57.     The Critical Habitat Rule defines "primary constituent elements" ("PCEs") as "those specific elements of the physical or biological features that provide for a species' life-history processes and are essential to the conservation of the species." 77 Fed. Reg. 71,904.

58.     The physical or biological features "essential to the conservation of the northern spotted owl" are forested lands that can be used for nesting, roosting, foraging, or dispersing.

59.     The PCEs of northern spotted owl critical nesting habitat "typically include a moderate to high canopy cover (60 to over 80 percent); a multilayered, multispecies canopy with large (greater than 30 inches (76 cm) dbh) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, mistletoe infections, and other evidence of decadence); large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for northern spotted owls to fly." 77 Fed. Reg. 71,905.

60.     Habitat that meets the species' needs for nesting and roosting generally also provides for foraging and dispersal. However, habitat that supports foraging or dispersal does not always support the other PCEs and does not necessarily provide for nesting or roosting. 77 Fed. Reg. 71,905.

61.     Subunit 1 of the Klamath West Critical Habitat Unit ("KLW-1"), and subunits 1, 2, and 3 of the Klamath East Critical Habitat Unit ("KLE-1", "KLE-2", and "KLE-3") overlap the Poor Windy and Evans Creek timber sales. Each critical habitat unit has a particular purpose for which it was designated.

62.     According to the Critical Habitat Rule, "[s]pecial management considerations or protection are required in" KLW-1, KLE-1, KLE-2, and KLE-3, "to address threats to the essential physical or biological features from current and past timber harvest, losses due to wildfire and the effects on vegetation from fire exclusion, and competition with barred owls." 77 Fed. Reg. 71,931, 71,933–34.

63.     KLW-1's functions include demographic support to the overall spotted owl population and for north-south and east-west connectivity between critical habitat units and subunits. KLW-1 sits at the western edge of an important connectivity corridor between coastal Oregon and the western Cascades. 77 Fed. Reg. 71,931.

64.     KLE-1's functions include demographic support to the overall population, as well as north-south and east-west connectivity between critical habitat units and subunits. 77 Fed. Reg. 71,933–34.

65.     KLE-2 and KLE-3's functions include east-west connectivity between critical habitat units and subunits, and demographic support. KLE-2 and KLE-3 facilitate northern spotted owl movements between the western Cascades and coastal Oregon and the Klamath Mountains. 77 Fed. Reg. 71,934.

66.     All of the forests within KLW-1, KLE-1, KLE-2, and KLE-3, including those targeted for logging by BLM, are "essential for the conservation of the species." 77 Fed. Reg. 71,931, 71,933–34. Increase and enhancement of habitat (as opposed to habitat removal) in these subunits "is necessary to provide for viable populations of northern spotted owls over the long term by providing for population growth, successful dispersal, and buffering from competition with the barred owl." *Id.*

67.     Inside and outside of designated critical habitat, spotted owl "core areas" should contain 50 percent (250 acres) or more acres of nesting-roosting habitat, and "home ranges" should contain 40 percent (1,158 acres) or more combined acres of nesting-roosting habitat, in order to avoid site abandonment. RMP 154.

68.     A spotted owl "activity center" or "territory" includes a spotted owl core area surrounded by a larger home range.

**Northern Spotted Owl Demography, Persistence, and Recovery**

69.     In the Pacific Northwest, researchers have been tracking the demography of the spotted owl for decades, including tracking estimated populations across the range of the species. Despite the protections afforded by listing under the Endangered Species Act, the spotted owl continues to decline. In 2016, researchers estimated that the spotted owl population has declined 3.8% per year rangewide. In 2018, researchers estimated that populations in all 11 demography study sites are now declining, and at an accelerated rate.

70.     Given the continued decline of northern spotted owl populations, the apparent intensifying threat from barred owls, and information indicating a recent loss of genetic diversity for the subspecies, retaining both occupied northern spotted owl sites and unoccupied, high value northern spotted owl habitat across the northern spotted owl's range are key requirements of recovery. Recovery Plan, III-42.

71.     Within the Klamath Study Area, which overlaps 68% of the Poor Windy timber sale action area and 7% of the Evans Creek timber sale action area, northern spotted owl survival has declined rapidly since 2006. Lesmeister et al. (2019). Nesting status was confirmed at only one site in the Klamath Study Area in 2018, and only one young fledged. Lesmeister et al. (2019).

72.     Detectability of northern spotted owls is known to decrease with the presence of barred owls. Olson et al. (2005, p. 924).

73.     Recent research has documented the importance of maintaining suitable northern spotted owl habitat in landscapes where barred owls are present. Wiens et al. (2014, p. 38) corroborated work by others who found that the "loss of habitat will likely further constrain the two species to the same set of limited resources, thereby increasing competitive pressure and leading to additional negative impacts on spotted owls." The findings of Dugger et al. (2016, p. 98) were also consistent with others who provided "recommendations to preserve as much high-quality habitat in late successional forests as possible across the range of the subspecies."

74.     Reduced habitat and increased habitat fragmentation will also increase the potential for competitive interactions between northern spotted and barred owls. The timber sale action areas and the larger landscape in which they exist are highly fragmented by a checkerboard ownership with private industrial timber lands that are mostly composed of non-habitat. As the amount of suitable habitat on BLM lands decreases during the course of timber sale implementation, competition with barred owls for habitat and prey is expected to increase in timber sale units where suitable habitat has yet to be harvested and in suitable habitat outside of the two timber sale areas.

75.     Spotted owls in the Poor Windy and Evans Creek timber sale planning areas are declining precipitously, and increased habitat loss and fragmentation, and barred owl encroachment, will likely result in the extirpation of spotted owls from the planning area.

**Wildfire Risk in Southwestern Oregon**

76.     The best available science indicates that forests in western North America are significantly departed from historical conditions. Intensive timber harvest has removed large-diameter fire-resilient tree species, and the advent of fire suppression in the early 20th century has removed the primary disturbance agent—wildfire—from the landscape. Because the region evolved with wildfire, the absence of this disturbance agent, plus historic timber harvest, has resulted in dense, overstocked forests that are especially prone to wildfire.

77.      The best available science also indicates that intensive timber harvest that removes all or most of the forest canopy and establishes young, second-growth early seral stands further increases the risk of future wildfire. This wildfire risk effect is especially pronounced in checkerboard landownership patterns that characterize the Poor Windy and Evans Creek timber sale project areas.

78.      Global climate change is resulting in hotter, drier summers, and less snow accumulation during the winters in the region. As a result, "fire season" in southwestern Oregon has grown longer and more unpredictable.

79.      In addition, humans have proliferated into the "wildland-urban interface," or the area between human development and undeveloped forestlands: this zone has increased by 41%— or 46 million acres—over the past 20 years. United States Forest Service, Areas where homes, forests mix increased rapidly over two decades, Northern Research Station (May 19, 2019), https://www.nrs.fs.fed.us/news/release/wui-increase.

80.      The Poor Windy timber sale project area has been significantly affected by past fires, including the Douglas Complex and Brimstone fires in 2014, the Taylor fire in 2018, and the Milepost 97 fire in 2019.

81.      The Evans Creek timber sale project area has been significantly affected by past fires, including the Grave Creek, Pleasant Creek, Snowshoe, and Ramsey Canyon fires in 2018, and the East Evans Creek fire in 2019.

**Medford District BLM's Fiscal Year 2019 Projects**

82.      On May 30, 2019, the Medford District of BLM transmitted its Biological Assessment ("BA") for the Medford BLM FY 2019 projects, comprised of the Poor Windy and Evans Creek timber sale projects ("FY 2019 BA"). In the FY 2019 BA, BLM determined that both timber sales may affect, and are likely to adversely affect spotted owls and their designated critical habitat, and therefore required formal consultation under Section 7(a)(2) of the ESA.

83.    On August 7, 2019, the Roseburg Field Office of FWS transmitted its combined BiOp for the Poor Windy and Evans Creek timber sales. In the BiOp, FWS concluded that the Poor Windy and Evans Creek timber sales were not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat.

84.    The Poor Windy and Evans Creek timber sales are located in southwest Oregon, between the Cascade mountain range and the Coast Range.

85.    Both timber sales are located on BLM land that is heavily "checkerboard:" every other square mile of land owned and managed by BLM alternates with lands managed by other landowners, primarily industry timberland owners that manage their lands on short rotations for commodity production.

86.    The Poor Windy timber sale authorizes 9,198 acres of logging in NRF habitat, 3,318 acres of logging in dispersal-only habitat, and 1,528 acres of logging in capable habitat. Of the 14,076 total acres of logging authorized by the Poor Windy timber sale, only 32 acres are non-habitat for northern spotted owls.

87.    In the KLW-1 critical habitat subunit, the Poor Windy timber sale authorizes the removal or downgrade of 904 acres of NRF habitat (1.31% of subunit total), and the removal of 242 acres of dispersal-only habitat (0.54% of subunit total). In the KLE-2 subunit, the Poor Windy timber sale authorizes the removal or downgrade of 327 acres of NRF habitat (0.61% of subunit total), and the removal of 119 acres of dispersal-only habitat (0.91% of subunit total). In the KLE-3 subunit, the Poor Windy timber sale authorizes the removal or downgrade of 258 acres of NRF habitat (0.67% of subunit total).

88.    The Evans Creek timber sale authorizes 1,261 acres of logging in NRF habitat, 468 acres of logging in dispersal-only habitat, and 75 acres of logging in capable habitat. Of the 1,920 total acres

of logging authorized by the Evans Creek timber sale, only 116 acres are non-habitat for northern spotted owls.

89.     In the KLE-1 subunit, the Evans Creek timber sale authorizes the removal of 11 acres of NRF habitat (0.008% of subunit total), and 1 acre of dispersal-only habitat (0.002% of subunit total). In the KLE-3 subunit, the Evans Creek timber sale authorizes the removal or downgrade of 796 acres of NRF habitat (2.06% of subunit total), and the removal of 106 acres of dispersal-only habitat (0.24% of subunit total).

90.     There are 61 known spotted owl sites in the Poor Windy timber sale project area. There are 39 known spotted owl sites in the Evans Creek project area.

91.     Of the 100 known spotted owl sites in the combined Poor Windy and Evans Creek timber sale project areas, only 20 are or were recently occupied.

92.     FWS determined that the Poor Windy timber sale project is likely to adversely affect 54 of 61 spotted owl sites (89%) in the project area. The Evans Creek timber sale project is likely to adversely affect 29 of 39 spotted owl sites (74%) in the project area. Together, the timber sales are likely to adversely affect 83 of 100 or 83% of spotted owl sites in the combined project area.

93.     Logging in the Poor Windy and Evans Creek timber sales "would remove large trees that could serve as spotted owl nest structure, reduce the overall average canopy cover within the affected stand to near or below approximately 40 percent, diminish the existing multi-canopy (layers), and other key habitat features, rendering the affected stands non-functional as spotted owl nesting habitat. These treatments, primarily large tree removal, are expected to result in mostly unusable NRF habitat within the affected stands for decades post-treatment."

94.     As much as 428 acres of NRF habitat will be removed from some spotted owl home ranges, representing 12.6% of a 3,400-acre home range.

95.     FWS determined that BLM would avoid incidentally taking northern spotted owls by delaying NRF removal and downgrading in occupied units until future surveys determine those units are unoccupied. When surveys indicate that these currently occupied sites are abandoned, logging will be permitted to occur and remove remaining suitable habitat.

96.     The Poor Windy and Evans Creek timber sale projects authorize logging in occupied spotted owl home ranges.

97.     The Poor Windy and Evans Creek timber sale projects authorize removal of trees immediately adjacent to known nest trees.

98.     FWS determined further that BLM would avoid incidentally taking northern spotted owls because of management direction at the RMP scale, including through incorporation of Recovery Actions 10 and 32.

99.     In the FY 2019 BiOp, FWS concluded that the Poor Windy and Evans Creek timber sales are not likely to jeopardize northern spotted owls or result in the destruction or adverse modification of the species' critical habitat.

100.    In determining that the Poor Windy and Evans Creek timber sales are not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat, FWS relied on the "future development of spotted owl habitat and management of barred owls in the" late successional reserve ("LSR") land use allocation, which it "expect[s] to provide for territories that will support future spotted owl populations."

**The 2019 Milepost 97 and East Evans Creek fires**

101.    At the time FWS finished preparing the FY 2019 BiOp and transmitted it to BLM, the Milepost 97 fire was actively burning near Canyonville, and the East Evans Creek fire was actively burning near Medford, Oregon. In its letter of transmittal, FWS stated that "[o]nce the fires have been suppressed, the District and the Service will evaluate and record the fire impacts. Depending

on the outcome of the evaluation, the District will reinitiate consultation as appropriate." FWS has not independently evaluated or recorded the effects of either fire.

102.    BLM subsequently prepared a Revised Environmental Assessment for the Poor Windy timber sale, which describes the effects of the Milepost 97 fire on the project area and modifies the project slightly. BLM also prepared a Documentation of Plan Conformance and Determination of National Environmental Policy Act Adequacy and a Final Decision Record for the Evans Creek timber sale, which describe the effects of the East Evans Creek fire on the project area.

103.    The Milepost 97 fire overlapped the KLW-1 critical habitat subunit, affecting approximately 3.7% of the subunit with mixed severity burns and reducing the amount of available NRF habitat in the subunit by 786 acres, to 68,069 acres.

104.    The Milepost 97 fire has significantly impaired the ability of KLW-1 to provide vital east-west habitat connectivity, altering the baseline at the subunit, unit, and habitat network scales. Five of the 61 northern spotted owl sites in the Poor Windy project area were affected by the Milepost 97 fire, with 3 of the sites having nest patch and core areas within the perimeter, and 2 sites having portions of the home range within the fire perimeter.

105.    The East Evans Creek fire affected 46 acres of dispersal habitat and 35 acres of nesting habitat within the Evans Creek project analysis area and the KLE-3 critical habitat subunit. In response to the fire, up to 1 mile of bulldozer line was constructed in spotted owl habitat within the analysis area, including approximately ¼ mile through nesting habitat and ¾ mile through dispersal habitat.

CLAIMS FOR RELIEF
FIRST CLAIM FOR RELIEF
Violation of the Endangered Species Act:
FWS failed to "consider important aspects of the problem" in the FY 2019 BiOp.

106.    Plaintiffs reallege all preceding paragraphs.

107.    In a BiOp, FWS is required to analyze and determine whether BLM's actions are likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). In doing so, FWS must utilize the best scientific and commercial data available. *Id.*

108.    The FY 2019 BiOp fails to consider at least three important aspects of the Poor Windy and Evans Creek timber sales: 1) the effects of habitat removal and downgrading on the barred owl's competitive advantage over northern spotted owls; 2) the effects of the Poor Windy and Evans Creek timber sales on 43 northern spotted owl site centers outside of the action area but with home ranges overlapping the action area; and 3) the effects of the action on northern spotted owls outside of historic home ranges.

109.    First, the best available science indicates that barred owls outcompete northern spotted owls across all habitat types and are more adaptable to lower quality habitat. FWS failed to analyze how the removal, downgrade, and modification of suitable spotted owl critical habitat through the Poor Windy and Evans Creek timber sales will disproportionately and adversely impact northern spotted owls by giving barred owls a greater competitive advantage over northern spotted owls in the timber sale project areas. FWS failed to consider this important aspect of the problem.

110.    Second, forty-three northern spotted owl site centers outside of the Poor Windy and Evans Creek action area have a portion of their home range overlapping the action area. FWS stated that "no treatments are proposed within these home ranges, so the District believes that no effects are anticipated to spotted owls associated with these 43 home ranges." FWS therefore did not consider effects to these 43 spotted owl sites. Removal and downgrade treatments within the action area are likely to adversely affect foraging and dispersal functions for the 43 northern spotted owl site centers with home ranges partially overlapping the action area. FWS failed to consider this important aspect of the problem.

111.    Third, the best available science indicates that northern spotted owls outside of historic

home ranges, often called "floater" owls, are critically important to maintaining overall population

viability. Floater owls have been spotted in at least two locations in the Poor Windy action area.

FWS failed to analyze how the Poor Windy and Evans Creek timber sales may affect floater owls or

their habitat. FWS failed to consider this important aspect of the problem.

112.    FWS's failure to analyze the effects of habitat removal and downgrade on barred owl's

competitive advantage over northern spotted owl, the effects of the Poor Windy and Evans Creek

timber sales on 43 northern spotted owl site centers outside but with home ranges overlapping the

action areas, and the timber sales' effects on floater owls, is arbitrary and capricious, and violates the

ESA. 5 U.S.C. § 706(2)(A), 16 U.S.C. § 1536(a)(2).

113.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this

litigation pursuant to the Equal Access to Justice Act. 28 U.S.C. § 2412.

## SECOND CLAIM FOR RELIEF
### Violation of the Endangered Species Act:
### FWS improperly relied on conservation measures.

114.    Plaintiffs reallege all preceding paragraphs.

115.    When preparing a BiOp under Section 7(a)(2) of the ESA, FWS may rely on mitigation and

conservation measures in determining an action is unlikely to jeopardize the continued existence of a

listed species or result in the destruction or adverse modification of its critical habitat, only if such

measures are reasonably specific, certain to occur, capable of implementation, subject to deadlines or

otherwise-enforceable obligations, and address threats to the species in a way that satisfies the

jeopardy and adverse modification standards.

116.    In concluding that the Poor Windy and Evans Creek timber sales were not likely to

jeopardize the continued existence of northern spotted owl or result in the destruction or adverse

modification of its critical habitat, FWS relied on treatments being "spread out over time" that "likely will be implemented over multiple years, and when funding becomes available."

117.    Treatments being spread out over time, and "likely … implemented over several years when funding becomes available," is not reasonably specific or certain to occur.

118.    In concluding that the Poor Windy and Evans Creek timber sales were not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat, FWS relied on "future development of spotted owl habitat and management of barred owls in the LSR" land use allocation, including through the experimental barred owl control program, to "provide for territories that will support future spotted owl populations."

119.    In light of climate change and the increasing occurrence and intensity of wildfire throughout southwestern Oregon, the future development of spotted owl habitat in the LSR is not reasonably certain to occur and does not address threats to the northern spotted owl in a way that satisfies the jeopardy and adverse modification standards.

120.    The experimental barred owl control program is only experimental and is not occurring in the Poor Windy and Evans Creek timber sale project areas, and it is unknown when or even if a permanent barred owl control program will be operational in the region. The continued operation of an experimental barred owl control program is dependent on the availability of continued funding, and is also dependent on state and federal permits to "take" barred owls, which may not be granted. Therefore, neither a continued experimental nor a permanent barred owl control program is reasonably certain to occur or subject to enforceable obligations.

121.    The decision of FWS to rely on measures that are not reasonably specific, certain to occur, capable of implementation, subject to deadlines or otherwise-enforceable obligations, and/or that address the threats to the species in a way that satisfies the jeopardy and adverse modification

standards, is arbitrary and capricious, and violates the ESA. 5 U.S.C. § 706(2)(A), 16 U.S.C. §
1536(a)(2).

122.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this
litigation pursuant to the Equal Access to Justice Act. 28 U.S.C. § 2412.

### THIRD CLAIM FOR RELIEF
### Violation of the Endangered Species Act:
### FWS failed to authorize incidental take for the Poor Windy and Evans Creek timber sales.

123.    Plaintiffs reallege all preceding paragraphs.

124.    The ESA requires FWS to issue an "incidental take statement" when it determines in the
BiOp that the action is not likely to jeopardize the continued existence of a listed species or result in
the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(4)(C)(i). An incidental
take statement "specifies the impact of such incidental taking on the species … ." *Id.*

125.    The FY 2019 BiOp authorizes no incidental take of northern spotted owls.

126.    FWS determined that the Poor Windy and Evans Creek timber sales would not result in
incidental take, "because of RMP management direction" that incorporates Recovery Actions and
prohibits incidental until a permanent barred owl control program is implemented.

127.    In pertinent part, the RMP incorporates 10 and 32 of the Recovery Plan. According to FWS,
"[b]y implementing these recovery actions, the District is collectively helping to address primary and
secondary threats to the spotted owl … ."

128.    The Poor Windy and Evans Creek timber sales do not "implement" Recovery Actions 10
and 32. Rather, FWS states that BLM is contributing to these Recovery Actions at the RMP level by
adopting land use allocations (e.g., harvest land base and LSR).

129.    Implementation of Recovery Actions 10 and 32 at the RMP level does not reduce the chance
that intensive logging in the Poor Windy and Evans Creek timber sale areas will result in local
incidental take of northern spotted owls.

130.    FWS determined that BLM would avoid incidental take by delaying NRF removal and downgrade in occupied units until future surveys determine those units are unoccupied.

131.    However, the Poor Windy and Evans Creek timber sales will further fragment the already fragmented nature of existing suitable habitat, exacerbate barred owl encroachment, and cause abandonment of currently occupied sites, effects that will result in the elimination of spotted owls from the planning area. The elimination of spotted owls from the planning area is at the very least an indirect effect—and likely a direct effect—of the proposed action for which FWS should have issued an incidental take statement.

132.    FWS's conclusion that the Poor Windy and Evans Creek timber sales will not result in incidental take is arbitrary and capricious, and violates the ESA. 5 U.S.C. § 706(2)(A), 16 U.S.C. § 1536(a)(2).

133.    FWS's conclusion that no incidental take authorization is required is arbitrary and capricious, and violates the ESA. 5 U.S.C. § 706(2)(A), 16 U.S.C. § 1536(a)(2).

134.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act. 28 U.S.C. § 2412.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Endangered Species Act:**
**BLM and FWS failed to reinitiate formal consultation in light of new information**
**concerning the 2019 Milepost 97 and East Evans Creek fires.**

135.    Plaintiffs reallege all preceding paragraphs.

136.    To comply with Section 7(a)(2) of the ESA, BLM and FWS must reinitiate and complete consultation where discretionary federal involvement or control over the action has been retained or is authorized by law, and new information reveals effects of the action that may affect listed species in a manner or to an extent not previously considered. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a)(2).

137.    The 2019 Milepost 97 fire overlapped the KLW-1 critical habitat subunit, affecting

approximately 3.7% of the subunit with mixed severity burns and reducing the amount of available

NRF habitat in the subunit by 786 acres, to 68,069 acres. As pictured below, the fire perimeter spans

the entirety of the largest east-west "bridge" of northern spotted owl critical habitat north of the

Siskiyou mountains.

138.



    ■ = KLW-1 subunit          ■ = Milepost 97 fire perimeter

    ■ = KLE-2 subunit          ■ = other subunits

139.    The Milepost 97 fire has significantly impaired the ability of KLW-1 to provide vital east-

west habitat connectivity, altering the baseline at the subunit, unit, and habitat network scales. Five

of the 61 northern spotted owl sites in the Poor Windy project area were affected by the Milepost 97

fire, with 3 of the sites having nest patch and core areas within the perimeter, and 2 sites having

portions of the home range within the fire perimeter. The Milepost 97 fire has altered the

environmental baseline of the Poor Windy and Evans Creek projects.

140.    The East Evans Creek fire affected 46 acres of dispersal habitat and 35 acres of nesting

habitat within the Evans Creek project analysis area and the KLE-3 critical habitat subunit. In

response to the fire, up to 1 mile of bulldozer line was constructed in spotted owl habitat within the analysis area, including approximately ¼ mile through nesting habitat and ¾ mile through dispersal habitat. The East Evans Creek fire has altered the environmental baseline of the Poor Windy and Evans Creek projects.

141.    BLM and FWS have unlawfully failed to reinitiate and complete consultation based on this new information concerning the Milepost 97 and East Evans Creek fires.

142.    The failure of BLM and FWS to reinitiate and complete consultation in light of the 2019 Milepost 97 and East Evans Creek fires is arbitrary and capricious, and not in accordance with law, 5 U.S.C. § 706(2)(A); and/or agency action unlawfully withheld, 5 U.S.C. § 706(1); and violates the ESA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a)(2).

143.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act. 28 U.S.C. § 2412.

### PLAINTIFFS' PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.  Declare that the FY 2019 BiOp is unlawful because it is arbitrary, capricious, an abuse of agency discretion, and not in accordance with law;

2.  Declare that the FY 2019 BiOp violates the ESA and its implementing regulations;

3.  Declare that the Incidental Take Statement is unlawful because it is arbitrary, capricious, an abuse of agency discretion, and not in accordance with law;

4.  Declare that the Incidental Take Statement violates the ESA and its implementing regulations;

5.  Enter an order vacating the FY 2019 BiOp;

6.  Enter an order vacating the Incidental Take Statement;

7.  Enter an order compelling BLM and FWS to reinitiate consultation under the ESA;

8.  Award Plaintiffs their costs of suit and attorneys' fees; and

9.  Grant Plaintiffs such other and further relief as the Court may deem just, proper, and

    necessary.

Respectfully submitted and dated this third day of August, 2020.

/s/ Sangye Ince-Johannsen

Sangye Ince-Johannsen (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
Ph. (541) 778-6626
sangyeij@westernlaw.org

Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon 97232
Ph. (503) 914-1323
brown@westernlaw.org

*Attorneys for Plaintiffs*

PAGE 29 – FIRST AMENDED COMPLAINT

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRCP 7.1, Plaintiffs state that they have not issued shares to the public and have no affiliates, parent companies, or subsidiaries issuing shares to the public.

Respectfully submitted and dated this third day of August, 2020.

/s/ Sangye Ince-Johannsen

Sangye Ince-Johannsen (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
Ph. (541) 778-6626
sangyeij@westernlaw.org

Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon 97232
Ph. (503) 914-1323
brown@westernlaw.org

*Attorneys for Plaintiffs*