SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914-1323 | Phone
brown@westernlaw.org

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, and CASCADIA WILDLANDS, | Civ. Case No. 20-cv-00952-AA |
| *Plaintiffs,* | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPENING MEMORANDUM IN SUPPORT OF MOTION** |
| v. | |
| UNITED STATES FISH AND WILDLIFE SERVICE, and UNITED STATES BUREAU OF LAND MANAGEMENT, | ORAL ARGUMENT REQUESTED |
| *Defendants.* | |

# TABLE OF CONTENTS

TABLE OF ACRONYMS .................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iii

MOTION ............................................................................................................. 1

MEMORANDUM ................................................................................................ 2
   I.    INTRODUCTION ................................................................................. 2
   II.   JURISDICTION ................................................................................... 2
   III.  STANDARD OF REVIEW ................................................................... 3
   IV.  LEGAL AND FACTUAL BACKGROUND .......................................... 4
       A.   The Endangered Species Act (ESA) ......................................... 4
       B.   The Northern Spotted Owl (*Strix occidentalis caurina*) ........................ 8
       C.   The Medford District BLM's FY 2019 Projects .................................... 14
       D.   The 2019 Milepost 97 and East Evans Creek Fires ............................ 17
   V.   ARGUMENT ........................................................................................ 19
       A.   The BiOp Failed to Analyze Effects of the Poor Windy and Evans Creek Timber Sales on Northern Spotted Owl. .................................... 19
           1.   The BiOp Failed to Analyze the Effects of Habitat Removal and Downgrade on the Barred Owl's Competitive Advantage. .............. 20
           2.   The BiOp Failed to Analyze Effects on Northern Spotted Owls Partially Outside of the Action Area ................................................ 24
           3.   The BiOp Failed to Analyze Effects on Northern Spotted Owls in the Action Area but Outside of Known Home Ranges. ..................... 25
       B.   The BiOp Unlawfully Relies on Measures That Are Not Reasonably Certain to Occur. ...................................................................................... 27
       C.   The BiOp's Determination of No Incidental Take is Arbitrary and Capricious. .............................................................................................. 31
       D.   Defendants Failed to Reinitiate Formal Consultation in Light of New Information Concerning the 2019 Wildfires. ....................................... 34
   VI.  CONCLUSION ..................................................................................... 41

CERTIFICATE OF COMPLIANCE ................................................................. 41

## TABLE OF ACRONYMS

APA.................Administrative Procedure Act

AR...............................Administrative Record

BiOp...................................Biological Opinion

BLM......... U.S. Bureau of Land Management

CHU.............................. Critical Habitat Unit

ESA........................... Endangered Species Act

FWS............... U.S. Fish and Wildlife Service

HLB ................................. Harvest Land Base

ITS .......................Incidental Take Statement

KLE .......................................... Klamath East

KLW ......................................... Klamath West

LSR....................... Late-Successional Reserve

NRF ............Nesting, Roosting, and Foraging

RMP...................Resource Management Plan

# TABLE OF AUTHORITIES

**Cases**

### United States Supreme Court

*Bennett v. Spear*, 520 U.S. 154 (1997)......................................................................2

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971).............................4

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ......................................................5, 6

### United States Courts of Appeals

*Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845 (9th Cir. 1997) ..................................4

*Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229 (9th Cir. 2001)........................4, 7

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020)...........*passim*

*Defs. of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 2000) ............................................6

*Defs. of Wildlife v. Zinke*, 856 F.3d 1248 (9th Cir. 2017) ...........................................37

*Friends of Animals v. FWS*, 879 F.3d 1000 (9th Cir. 2018) ..................................28, 29

*Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010) .............................4

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012)....................3

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008).........................................3, 4

*Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441 (9th Cir. 1992)...............34, 35

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  524 F.3d 917 (9th Cir. 2008)..............................................................................29, 30

*Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2010)...................................22

*Or. Nat. Res. Council v. Lowe*, 109 F.3d 521 (9th Cir. 1997).....................................4

*Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008).......34

*San Luis & Delta-Mendoza Water Auth. v. Locke*, 776 F.3d 971 (9th Cir. 2014) ........7

*Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987)..........................................34, 38

*Turtle Island Restoration Network v. U.S. Dept. of Commerce*,
  878 F.3d 725 (9th Cir. 2017) ..................................................................................34

### United States District Courts

*Audubon Soc'y of Portland v. FWS*,
  No. 3:21-cv-00443-JAR (D. Or. Mar. 23, 2021) .................................................11

*California v. Bernhardt*, 460 F. Supp. 3d 875 (N.D. Cal. 2020) ..................................8

*Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006)........7, 33

*Native Fish Society v. Nat'l Marine Fisheries Servs.*,
  992 F. Supp. 2d 1095 (D. Or. 2014) ...............................................19, 22, 23, 24

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
  No. 3:10-cv-1129-AC, 2013 WL 1294647 (D. Or. Mar. 27, 2013) ....................34

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
  No. Civ.C02-2006-SBA, 2006 WL 798920 (N.D. Cal. Mar. 27, 2006) .............37

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
  723 F. Supp. 2d 1247 (E.D. Cal. 2010) ....................................................*passim*

*Wilderness Society v. Wisely*, 524 F. Supp. 2d 1285 (D. Colo. 2007)..........................25

## Federal Statutes

5 U.S.C. § 701 ........................................................................................ 2
5 U.S.C. § 704 ........................................................................................ 2
5 U.S.C. § 706 ........................................................................................ 3
16 U.S.C. § 1531 ............................................................................ 2, 4, 5
16 U.S.C. § 1532(5)(A)(i) ..................................................................... 5
16 U.S.C. § 1532(19) ...................................................................... 6, 26
16 U.S.C. § 1533(a)(3) .......................................................................... 5
16 U.S.C. § 1533(f)(1) .......................................................................... 5
16 U.S.C. § 1533(f)(1)(B)(i) ................................................................. 5
16 U.S.C. § 1536(a)(2) ................................................................. *passim*
16 U.S.C. § 1536(b) ............................................................................... 5
16 U.S.C. § 1536(b)(4) ...................................................................... 6, 7
16 U.S.C. § 1538(a)(1)(B) ..................................................................... 6
28 U.S.C. § 1331 .................................................................................... 2
28 U.S.C. § 1391 .................................................................................... 3
28 U.S.C. § 2201 .................................................................................... 3
28 U.S.C. § 2203 .................................................................................... 3

## Federal Regulations

50 C.F.R. § 17.11(h) ........................................................................... 10
50 C.F.R. § 17.31 ................................................................................... 6
50 C.F.R. § 402.01(b) ............................................................................ 7
50 C.F.R. § 402.02 ......................................................................... 25, 26
50 C.F.R. § 402.14(g)(7) ....................................................................... 6
50 C.F.R. § 402.14(g)(8) ....................................................................... 7
50 C.F.R. § 402.16(a) ........................................................... 8, 19, 36, 40

## Miscellaneous

FED. R. CIV. P. 56(a) .......................................................................... 1, 3
FWS, *Barred Owl Study Update* ........................................................ 13
*12-Month Finding for the Northern Spotted Owl,*
    85 Fed. Reg. 81,144 (Dec. 15, 2020) ............................................. 10
*Determination of Threatened Status for the Northern Spotted Owl,*
    55 Fed. Reg. 26,114 (June 26, 1990) .............................................. 10
*Protection for Threatened Species of Wildlife,*
    43 Fed. Reg. 18,180 (Apr. 28, 1978) ................................................. 6
*Regulations for Interagency Cooperation,*
    84 Fed. Reg. 44,976 (Aug. 27, 2019) ................................................ 8
*Revised Critical Habitat for the Northern Spotted Owl: Final Rule,*
    77 Fed. Reg. 71,876 (December 4, 2012) .................................. *passim*
*Revised Designation of Critical Habitat for the Northern Spotted Owl,*
    86 Fed. Reg. 4,820 (Jan. 15, 2021) ............................................ 10, 11
    86 Fed. Reg. 11,892 (Mar. 1, 2021) ................................................ 11

## MOTION

Plaintiffs Klamath-Siskiyou Wildlands Center, Oregon Wild, and Cascadia Wildlands (collectively, "KS Wild") respectfully move the Court pursuant to FED. R. CIV. P. 56(a) for summary judgment on all claims against Federal Defendants U.S. Bureau of Land Management ("BLM") and U.S. Fish and Wildlife Service ("FWS"), as set forth in KS Wild's Amended Complaint filed August 3, 2020 (doc. 7). This Motion is supported by the following Memorandum and the First Declarations of George Sexton (doc. 17-1) and Gabe Scott (doc. 17-2), filed herewith.

KS Wild seeks a declaration that the Biological Opinion for the Poor Windy and Evans Creek timber sales ("FY 2019 BiOp") and the accompanying Incidental Take Statement ("ITS") violate the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA"), and their implementing regulations. KS Wild seeks a declaration that BLM and FWS have unlawfully failed to reinitiate consultation on the Poor Windy and Evans Creek timber sales to reconsider them in light of the 2019 Milepost 97 and East Evans Creek fires, in violation of the ESA, APA, and their implementing regulations. To remedy these violations of law, KS Wild asks the Court to vacate the FY 2019 BiOp and ITS and remand them to BLM and FWS, and to order the BLM and FWS to reinitiate consultation.

# MEMORANDUM

## I.    INTRODUCTION

This is a case about an imperiled owl that, though increasingly rare across its range, has become a familiar fixture in federal court. The northern spotted owl makes its appearance in this case for all-too-familiar reasons: federal agencies approving timber sales in core northern spotted owl habitat without adequately analyzing effects to the spotted owls that reside there. The federal agencies here relied on unproven and hypothetical measures in approving the timber sales, all the while ignoring dire adverse effects and two major wildfires that changed the affected habitat in unexamined ways at a time when northern spotted owl populations are plummeting and the threat of competition from the invasive barred owl has reduced spotted owl reproduction to record low levels. The federal defendants have shirked their legal obligations at the time when the species needs all the protection the law provides.

## II.    JURISDICTION

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question). The causes of action arise under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*; and the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*; and their implementing regulations. The FY 2019 BiOp constitutes final agency action subject to immediate judicial review. 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The requested relief is

proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706. An actual,

justiciable controversy exists between Plaintiffs and Defendants.

Venue in this Court is proper under 28 U.S.C. § 1391 because all or a

substantial part of the events or omissions giving rise to the claims herein occurred

within this judicial district. The BLM and FWS officials who authorized and

approved the challenged decisions are headquartered in Medford, Oregon and

Roseburg, Oregon, respectively, both of which are located within this district.

Plaintiffs have offices within this district.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a). Judicial review of agency actions under the ESA is governed by the

APA. 5 U.S.C. § 706; *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017

(9th Cir. 2012) (en banc). Under the APA, "[t]he reviewing court shall . . . hold

unlawful and set aside agency action, findings, and conclusions found to be

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A).

An agency action is arbitrary and capricious "if the agency relied on factors

Congress did not intend it to consider, 'entirely failed to consider an important

aspect of the problem,' or offered an explanation 'that runs counter to the evidence

before the agency or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise.'" *Lands Council v. McNair*, 537 F.3d 981,

987 (9th Cir. 2008) (internal citation omitted). The arbitrary and capricious standard is deferential, but it does not shield agency decisions from a "thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). FWS must articulate "a rational connection between the facts found and the conclusions made." *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). It is not entitled to deference where its conclusions "do not have a basis in fact." *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1236 (9th Cir. 2001).

An agency's decision can be upheld only on the basis of the reasoning found in that decision; the reviewing court cannot substitute reasons for agency action that are not in the record. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997). Rationales for agency decision-making appearing for the first time in litigation are post hoc explanations that cannot be used to justify agency action. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049–50 (9th Cir. 2010) (internal citation omitted).

## IV.    LEGAL AND FACTUAL BACKGROUND

### A.    The Endangered Species Act (ESA)

Congress enacted the ESA in 1973 in order "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Congress further declared its policy that all federal agencies "shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance" of the ESA's

purposes. 16 U.S.C. § 1531(c). The ESA obligates federal agencies "to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).

Section 4 of the ESA requires FWS to "designate any habitat" of a listed species that is "considered to be critical habitat." 16 U.S.C. § 1533(a)(3). The ESA defines critical habitat as "the specific areas within the geographical area occupied by the species, at the time it is listed[,] . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection[.]" 16 U.S.C. § 1532(5)(A)(i). Section 4 of the ESA also directs FWS to develop and implement "recovery plans . . . for the conservation and survival" of listed species and incorporate "a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species[.]" 16 U.S.C. §§ 1533(f)(1) & 1533(f)(1)(B)(i).

Section 7 of the ESA requires every federal agency, in consultation with FWS, to insure that its actions are "not likely to jeopardize the continued existence of any endangered . . . or threatened species or result in the destruction or adverse modification of" an endangered or threatened species' critical habitat. 16 U.S.C. § 1536(a)(2). The result of Section 7 consultation is a biological opinion ("BiOp"), which whether an action is or is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(b). Section 7 "reveals a conscious decision by Congress to

give endangered species priority over the 'primary missions' of federal agencies."
*Tenn. Valley Auth.*, 437 U.S. at 185.

The ESA also prohibits the "take" of endangered and threatened species. 16
U.S.C. § 1538(a)(1)(B); *Protection for Threatened Species of Wildlife*, 43 Fed. Reg.
18,180 (Apr. 28, 1978), *codified at* 50 C.F.R. § 17.31 (extending the "take"
prohibition to threatened species). "Take" means "to harass, harm, pursue, hunt,
shoot, wound, kill, trap, capture, or collect . . . ." 16 U.S.C. § 1532(19). "Harming a
species may be indirect, in that the harm may be caused by habitat modification,
but habitat modification does not constitute harm unless it 'actually kills or injures
wildlife.'" *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 924–25 (9th Cir. 2000). "Habitat
modification that is reasonably certain to injure an endangered species by impairing
their essential behavioral patterns satisfie[s] the actual injury requirement . . . ."
*Id.* at 925 (citing *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781,
783 (9th Cir. 1995)).

Once FWS has determined that an action is not likely to jeopardize a listed
species or result in the destruction or adverse modification of its critical habitat, it
must determine whether an action is likely to result in any "incidental take" of
endangered or threatened species. If FWS determines that an action "is reasonably
certain" to result in incidental take of that species, it must issue an incidental take
statement ("ITS"). 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7). The ITS must (i)
specify the impact of incidental taking; (ii) specify reasonable and prudent measures
that are necessary or appropriate to minimize such impact; and (iv) set forth the

terms and conditions that the agency and/or third party must comply with in order to implement specified reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(C). Once issued, an ITS "functions as a safe harbor provision immunizing persons" and agencies from liability under Section 9 of the ESA. *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1239.

In carrying out consultation under the ESA, FWS must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). "[F]ailure to do so violates the APA." *San Luis & Delta-Mendoza Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). The purpose of the "best scientific and commercial data" standard is to ensure a Biological Opinion is not based on "speculation and surmise." *Id.* (citing *Bennett v. Spear*, 520 U.S. 154, 176 (1997)); *see also Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115, 1127 (N.D. Cal. 2006) ("To the extent that there is any uncertainty as to what constitutes the best available scientific information, Congress intended 'to give the benefit of the doubt to the species.'" (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988))).

The Secretary of Interior and the Secretary of Commerce co-administer the ESA and have delegated the authority to implement the ESA to FWS and the National Marine Fisheries Service, respectively. 50 C.F.R. § 402.01(b). The ESA's implementing regulations were amended on August 27, 2019, after the FY 2019

BiOp was prepared and transmitted. *Regulations for Interagency Cooperation*, 84 Fed. Reg. 44,976 (Aug. 27, 2019).[1]

Reinitiation of formal consultation under Section 7 of the ESA "is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and: . . . (2) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered[.]" 50 C.F.R. § 402.16(a).

## B.    The Northern Spotted Owl (*Strix occidentalis caurina*)

The northern spotted owl is a medium-sized dark brown owl, with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks. *Revised Critical Habitat for the Northern Spotted Owl: Final Rule*, 77 Fed. Reg. 71,876, 71,883 (December 4, 2012), *available at FWS AR 000720*. The northern spotted owl occupies late-successional and old-growth forest habitat in the Pacific Northwest, from southern British Columbia as far south as Marin County, California. *Id*. at 71,883–84. Northern spotted owls rely on older forest habitats because these forests generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. *Id*. at 71,884. These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy

---

[1] These regulations are the subject of ongoing litigation. *See California v. Bernhardt*, 460 F. Supp. 3d 875 (N.D. Cal. 2020).

closure; a high incidence of trees with large cavities and other types of deformities;

numerous large snags; an abundance of large, dead wood on the ground; and open

space within and below the upper canopy for owls to fly. *Id*. Forested stands with

high canopy closure also provide thermal cover and protection from predation. *Id*.

This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat. *BLM*

*AR 01668*.

Northern spotted owls also require habitat to disperse to new territories. The

FY 2019 BiOp explains that

> Natal dispersal of spotted owls typically occurs in September and October
> with a few individuals dispersing in November and December. Natal
> dispersal occurs in stages, with juveniles settling in temporary home ranges
> between bouts of dispersal . . . . Dispersing juvenile spotted owls experience
> high mortality rates, exceeding 70 percent in some studies. Known or
> suspected causes of mortality during dispersal include starvation, predation,
> and accidents...Successful dispersal of juvenile spotted owls may depend on
> their ability to locate unoccupied suitable habitat in close proximity to other
> occupied sites. . . .
>
> Dispersal can also be described as having two phases: transience and
> colonization. Fragmented forest landscapes are more likely to be used by owls
> in the transience phase as a means to move rapidly between denser forest
> areas. Movements through mature and old growth forests occur during the
> colonization phase when birds are looking to become established in an area.
> Transient dispersers use a wider variety of forest conditions for movements
> than colonizing dispersers, who require habitats resembling
> nesting/roosting/foraging habitats used by breeding birds. Dispersal success
> is likely highest in mature and old growth forest stands where there is more
> likely to be adequate cover and food supply.

*BLM AR 00470–71* (internal references omitted). Dispersal is essential to

maintaining stable populations of owls by filling territorial vacancies when resident

northern spotted owls die or leave their territories, and to providing adequate gene

flow across the range of the species. 77 Fed. Reg. 71,902.

Page 9 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Spotted owls are understood to "forage over a wide area and subsequently return to a nest or roost location that is often centrally-located within the home range." *BLM AR 06335*. This central location is referred to as an "activity center." *Id*. "An area of concentrated use within a home range that receives disproportionately high use, . . . commonly includ[ing] nest sites, roost sites, and foraging areas close to the activity center" is referred to as a "core use area." *Id*. (internal references omitted).

Due to concerns over its widespread habitat loss and habitat modification, and the lack of regulatory mechanisms to protect the species, FWS listed the northern spotted owl as a threatened species under the ESA in 1990. *Determination of Threatened Status for the Northern Spotted Owl*, 55 Fed. Reg. 26,114 (June 26, 1990), *codified at* 50 C.F.R. § 17.11(h). In late 2020, FWS found that uplisting the northern spotted owl to endangered species status is "warranted but precluded by higher priority actions" due to continued habitat loss and competition with the invasive barred owl. *12-Month Finding for the Northern Spotted Owl*, 85 Fed. Reg. 81,144 (Dec. 15, 2020).

Critical habitat was designated for the species in 1992, and revised in 2008 and 2012. 77 Fed. Reg. 71,876. Despite the best available science establishing that more spotted owl habitat, not less, warrants federal protection, FWS recently reduced spotted owl critical habitat by excluding approximately 3.5 million acres on federal lands pursuant to a settlement agreement with the timber industry. *Revised Designation of Critical Habitat for the Northern Spotted Owl*, 86 Fed. Reg. 4,820

(Jan. 15, 2021). That revision of northern spotted owl critical habitat is the subject

of judicial review, and its effective date has been delayed. *Audubon Soc'y of*

*Portland v. FWS*, No. 3:21-cv-00443-JAR (D. Or. Mar. 23, 2021); 86 Fed. Reg. 11,892

(Mar. 1, 2021).

The 2012 Critical Habitat Rule designated 11 critical habitat units ("CHUs")

and 60 subunits across the range of the species. 77 Fed. Reg. 71,876. The critical

habitat network serves many functions, but for the purposes of this case, "the

conservation role or value of northern spotted owl critical habitat is to adequately

support the life-history needs of the species to the extent that well-distributed and

interconnected northern spotted owl nesting populations are likely to persist within

properly functioning ecosystems at the critical habitat unit and range-wide scales."

*Id*. at 71,938. In other words, the critical habitat network allows owls to move

between and among designated critical habitat units.

In designating critical habitat for the species in 2012, FWS explained

Although the term "dispersal" frequently refers to post-fledgling movements
of juveniles, for the purposes of this rule we are using the term to include all
movement during both the transience and colonization phase, and to
encompass important concepts of linkage and connectivity among owl
subpopulations. Population growth can only occur if there is adequate habitat
in an appropriate configuration to allow for the dispersal of owls across the
landscape.

*Id*. at 71,906. In establishing the critical habitat network in 2012, FWS observed

that "this network has the potential to support an increasing or stable population

trend of northern spotted owls, exhibits relatively low extinction risk, both

rangewide and at the recovery unit scale . . . and achieves adequate connectivity among recovery units, while prioritizing reliance on public lands." *Id*. at 71,914.

In particular, "[s]pecial management considerations or protection are required" for the Klamath West 1 ("KLW-1") subunit of the Klamath West CHU and the Klamath East 2 ("KLE-2") subunit of the Klamath East CHU, in order "to address threats to the essential physical or biological features from current and past timber harvest, losses due to wildfire and the effects on vegetation from fire exclusion, and competition with barred owls." *Id*. at 71,931, 71,934. KLW-1's functions include demographic support to the overall spotted owl population and for north-south and east-west connectivity between critical habitat units and subunits, and sits at the western edge of an important spotted owl connectivity corridor between coastal Oregon and the western Cascades. *Id*. at 71,931; *BLM AR 00138*. The purpose of KLE-2 is to provide demographic support and east-west connectivity between critical habitat units and subunits, facilitating northern spotted owl movements between the western Cascades, coastal Oregon, and the Klamath Mountains. *Id*. at 71,934. All of the forests within KLW-1 and KLE-2 are "essential for the conservation of the species." *Id*. at 71,931, 71,934.

Barred owls (*Strix varia*) are native to North America, but only recently arrived in the Pacific northwest. *BLM AR 010152*. Barred owls are slightly larger and more aggressive than spotted owls and compete for similar habitat. *Id*. A primary reason why barred owl incursion poses such a grave threat to northern spotted owl survival and recovery is that barred owls outcompete northern spotted

owls across habitat classes, while adapting to inferior habitat more readily than northern spotted owls. *BLM AR 04567*. The best available science recognizes "a strong potential for both exploitation and interference competition between spotted owls and recently established barred owls, and that availability of old forests and associated prey species are likely to be the most strongly limiting factors in the competitive relationship between these species[,]" and "the importance of maintaining high-quality habitat in late-successional forests" for the persistence of northern spotted owls. *Id.*

FWS is engaged in an experimental control program for barred owls involving lethal removal of the invader. FWS, *Barred Owl Study Update*, *available at* https://www.fws.gov/oregonfwo/articles.cfm?id=149489616 (announcing decision to continue the barred owl removal experiment through August 2021). A portion of the experimental control program, the Union/Myrtle (Klamath) Study Area, is near the Poor Windy and Evans Creek timber sales. *BLM AR 04963* (study area description), *04965* (study area map); *FWS AR 019670* (regional map). A permanent control program is intended to be implemented beginning sometime between 2021 and 2023. *BLM AR 01815*.

Given the continued decline of northern spotted owl populations, the apparent increase in severity of the threat from barred owls, and information indicating a recent loss of genetic diversity for the subspecies, FWS determined that retaining both occupied northern spotted owl sites and unoccupied, high-value northern spotted owl habitat across the northern spotted owl's range are key

components for recovery. 77 Fed. Reg. 71,879; *BLM AR 06147–48*. The 2011

Northern Spotted Owl Recovery Plan states: "Because spotted owls on established

territories are likely to be more successful if they remain in those locations,

managing to retain spotted owls at existing sites should be the most effective

approach to bolstering the demographic contribution of a habitat conservation

network and the highest priority for land managers." *BLM AR 06148* (internal

references omitted). Recovery of the northern spotted owl depends on the retention

of all suitable habitat in the near term, development of suitable habitat in the

longer term, and successful barred owl control. *Id.* at *06148–49*.

### C.    The Medford District BLM's FY 2019 Projects

On August 7, 2019, the Roseburg Field Office of FWS transmitted its

combined BiOp for the Medford District BLM's FY 2019 Batch of Projects,

comprised of the Poor Windy and Evans Creek timber sales. *BLM AR 00324*. As

consulted on, the Poor Windy and Evans Creek timber sales authorize timber

harvest and fuel reduction maintenance on approximately 15,996 acres of BLM-

administered land in southwest Oregon. *Id.* at *00331*. Of the 15,996 total acres

authorized for treatment, 14,245 acres are northern spotted owl habitat, 1,603 are

capable habitat, and 148 acres are non-habitat. *BLM AR 00736*. Despite the timber

sales' extensive adverse effects to northern spotted owls and designated critical

habitat, FWS concluded that the timber sales were not likely to jeopardize the

continued existence of the northern spotted owl or result in the destruction or

adverse modification of its critical habitat, and that the timber sales would result in no incidental take of northern spotted owl. *BLM AR 00437*, *00441*.

The Poor Windy and Evans Creek timber sales are located in southwest Oregon, between the Cascade mountain range and the Coast Range. Both timber sales are located on BLM land that is heavily "checkerboarded:" every other square mile of land owned and managed by BLM alternates with lands managed by other landowners, primarily industry timberland owners that manage their lands on short rotations for commodity production. *BLM AR 00038*.

The Poor Windy timber sale authorizes 9,198 acres of logging in NRF habitat, 3,318 acres of logging in dispersal-only habitat, and 1,528 acres of logging in capable habitat. *BLM AR 00342*. In the KLW-1 critical habitat subunit, the Poor Windy timber sale authorizes the removal or downgrade of 904 acres of NRF habitat and the removal of 242 acres of dispersal-only habitat. *Id*. at *00425*. In the KLE-2 subunit, the Poor Windy timber sale authorizes the removal or downgrade of 327 acres of NRF habitat and the removal of 119 acres of dispersal-only habitat. *Id*. In the KLE-3 subunit, the Poor Windy timber sale authorizes the removal or downgrade of 258 acres of NRF habitat. *Id*. FWS determined that the Poor Windy timber sale project is likely to adversely affect 54 of 61 spotted owl sites (89%) in the project area. *Id*. at *00396*.

The Evans Creek timber sale authorizes 1,261 acres of logging in NRF habitat, 468 acres of logging in dispersal-only habitat, and 75 acres of logging in capable habitat. *Id*. at *00342*. In the KLE-1 subunit, the Evans Creek timber sale

authorizes the removal of 11 acres of NRF habitat and 1 acre of dispersal-only habitat. *Id*. at *00425*. In the KLE-3 subunit, the Evans Creek timber sale authorizes the removal or downgrade of 796 acres of NRF habitat and the removal of 106 acres of dispersal-only habitat. *Id*. The Evans Creek timber sale project is likely to adversely affect 29 of 39 spotted owl sites (74%) in the project area. *Id*. at *00396*. Logging has already begun in portions of the Evans Creek timber sale project including the Evans Gem sale.

Logging in the Poor Windy and Evans Creek timber sales "would remove large trees that could serve as spotted owl nest structure, reduce the overall average canopy cover within the affected stand to near or below approximately 40 percent, diminish the existing multi-canopy (layers), and other key habitat features, rendering the affected stands non-functional as spotted owl nesting habitat. These treatments, primarily large tree removal, are expected to result in mostly unusable NRF habitat within the affected stands for decades post-treatment." *BLM AR 00389*. The Poor Windy and Evans Creek timber sales authorize the removal of 4,902 acres of NRF from within spotted owl home ranges, and as much as 428 acres of NRF habitat may be removed from a single spotted owl home range. *Id*. at *00397*. The timber sales as consulted on do not prohibit logging immediately adjacent to known nest trees. *BLM AR 00535–36* (no mandatory project design criteria establishing a year-round buffer around known nest trees).

The Poor Windy and Evans Creek timber sales were planned under the 2016 Resource Management Plan ("RMP") for southwest Oregon. *BLM AR 00863–01189*

("2016 RMP"). The 2016 RMP includes a number of land use allocations ("LUAs");
pertinent here, the Late Successional Reserves ("LSR") and the Harvest Land Base
("HLB"). *BLM AR 00325*. The 2016 RMP defines the HLB as "[t]hose lands on which
the determination and declaration of the Annual Productive Capacity/Allowable
Sale Quantity (ASQ) is based." *BLM AR 01176*. The LSRs include "late-successional
and old-growth forest ecosystems, which serve as habitat for late-successional and
old-growth forest-related species including the northern spotted owl." *BLM AR
08889*. The LSRs are "the focal point for spotted owl recovery under the BLM's
revised RMP." *BLM AR 00325*.

### D.    The 2019 Milepost 97 and East Evans Creek Fires

At the time FWS finished preparing the FY 2019 BiOp and transmitted it to
BLM, the Milepost 97 fire was actively burning near Canyonville, and the East
Evans Creek fire was actively burning near Medford, Oregon. *BLM AR 00326*. In its
letter of transmittal, FWS stated that "[o]nce the fires have been suppressed, [BLM]
and [FWS] will evaluate and record the fire impacts. Depending on the outcome of
the evaluation, the [BLM] will reinitiate consultation as appropriate." *Id*. The
agencies have not reinitiated consultation. *BLM AR 00001*.

After the fire was suppressed, BLM subsequently prepared a Revised
Environmental Assessment for the Poor Windy timber sale, which purports to
describe the effects of the Milepost 97 fire on the project area and modifies the
project slightly. *BLM AR 00108*. BLM also prepared a Documentation of Plan
Conformance and Determination of National Environmental Policy Act Adequacy

and a Final Decision Record for the Evans Creek timber sale, which purports to describe the effects of the East Evans Creek fire on the project area. *BLM AR 00101*, *00071*. FWS prepared a 17-page memorandum on the impact of the fires, claiming to explain why reinitiation of consultation was not required. *BLM AR 00034–50*.

The 13,094-acre Milepost 97 Fire overlapped the KLW-1 critical habitat subunit, affecting approximately 3.7% of the subunit with mixed severity burns and reducing the amount of available NRF habitat in the subunit by 786 acres, to 68,069 acres. *BLM AR 00137–38*. Five of the 61 northern spotted owl activity centers in the Poor Windy project area were affected by the Milepost 97 Fire: 3 sites have nest patch and core areas within the fire perimeter, and 2 sites have portions of the home range within the fire perimeter. *Id*. at *00139*.

The 125-acre East Evans Creek Fire burned entirely within KLE-3. *BLM AR 00037*. "The East Evans Creek Fire occurred within two of the 39 Evans Creek spotted owl home ranges originally analyzed in the consultation. . . . Habitat conditions changed at the collective seven sites as a result of the fires. The NRF habitat reduction at the home range scale ranged from 0.2 to 11 percent and 1 to 21 percent within three core-use areas impacted by the fires." *Id*. at *00035*. BLM explained that while "[f]ire severity data is not available for the East Evans Creek fire and will not be available in the future because the fire was so small," it appeared that this fire burned "at a light to moderate severity." *Id*. at *00034*. Regardless, BLM "assume[d] all 34 acres of NRF and 46 acres of dispersal-only

habitat on Federal lands was removed or downgraded due to the Evans Creek fire."
*Id*. at *00034–35*.

On May 27, 2020, Plaintiffs notified FWS and BLM that the agencies were
required to reinitiate consultation under Section 7(a)(2) of the ESA, in order to
consider new information concerning the 2019 wildfires that reveal effects of the
action in a manner and to an extent not considered in the FY 2019 BiOp, pursuant
to 50 C.F.R. § 402.16(a)(2). *BLM AR 00022*. KS Wild filed suit on June 12, 2020
(doc. 1). On July 17, 2020, FWS and BLM responded to Plaintiffs' notice letter,
asserting the agencies' position that reinitiation of formal consultation is not
required. *BLM AR 00001*. KS Wild amended its complaint on August 3, 2020 to
include a Fourth Claim for Relief alleging the federal defendants' failure to
reinitiate consultation violates the ESA (doc. 7).

V.    **ARGUMENT**

   A.    **The BiOp Failed to Analyze Effects of the Poor Windy and
         Evans Creek Timber Sales on Northern Spotted Owl.**

A BiOp is arbitrary and capricious if it "entirely failed to consider an
important aspect of the problem . . . ." *Native Fish Society v. Nat'l Marine Fisheries
Servs.*, 992 F. Supp. 2d 1095, 1111 (D. Or. 2014) (quoting *Motor Vehicle Mfrs. Ass'n.
v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983)). As this Court has explained,
"[i]n the context of the ESA, the 'problem' is whether a proposed project will cause
jeopardy to a listed species[,] and 'any effect that is likely to adversely affect the
species is plainly an important aspect of the problem.'" *Id*. (quoting *S. Yuba River
Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F. Supp. 2d 1247, 1270 (E.D.

Cal. 2010)). An agency action is "not likely to adversely affect" a listed species "when effects on listed species are expected to be discountable, or insignificant, or completely beneficial . . . . Insignificant effects relate to the size of the impact and should never reach the scale where take occurs. Discountable effects are those extremely unlikely to occur. Based on best judgment, a person would not: (1) be able to meaningfully measure, detect, or evaluate insignificant effects; or (2) expect discountable effects to occur." *FWS AR 082760–61* (Section 7 Handbook); *see S. Yuba River Citizens League*, 723 F. Supp. 2d at 1270 (relying on the Section 7 Handbook's definition in determining that a BiOp failed to consider important aspects of the problem).

The FY 2019 BiOp here fails to consider at least three important aspects of the Poor Windy and Evans Creek timber sales: 1) the effects of habitat removal and downgrading on the barred owl's competitive advantage over northern spotted owls; 2) the effects of the Poor Windy and Evans Creek timber sales on 43 northern spotted owl activity centers outside of the action area but with home ranges overlapping the action area; and 3) the effects of the action on northern spotted owls outside of historic home ranges (known as "floaters").

### 1.    The BiOp Failed to Analyze the Effects of Habitat Removal and Downgrade on the Barred Owl's Competitive Advantage.

The best available science indicates that barred owls outcompete northern spotted owls across all habitat types and—though they preferentially select for older, more structurally complex forests occupied by spotted owls—are habitat generalists and are more adaptable to lower quality habitat. *BLM AR 04567*.

Page 20 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Experts have observed that barred owls adapt more readily to inferior habitat conditions, cautioning that the "availability of old forests and associated prey species are likely to be the most strongly limiting factors in the competitive relationships between these species[,]" and highlight "the importance of maintaining high-quality habitat in late-successional forests." *Id.*

Reduction in forest cover caused by the implementation of the Poor Windy and Evans Creek timber sales can be expected to disproportionately affect northern spotted owls relative to barred owls, leaving barred owls better adapted to the post-logging landscape than northern spotted owls. *See BLM AR 03402* ("[C]urrent research provides no evidence that the BLM can manage individual forest stands to provide northern spotted owls with a competitive advantage over barred owls. Instead, research reaffirms the importance of older forest conditions and managing for large blocks of unfragmented older forest") (internal citations omitted). Increased competition with barred owls "is resulting in increased northern spotted owl site abandonment, reduced colonization rates, and likely reduction in reproduction." *BLM AR 00760*. This effect of habitat removal and downgrading is likely to compound the barred owl threat to northern spotted owls in the project areas for decades to come, but is not adequately considered in FY 2019 BiOp.

The FY 2019 BiOp acknowledges that "many studies suggest that the two species compete for resources and maintaining older, high quality forest habitat may help spotted owls persist, at least in the short term." *BLM AR 00420–21*. The FY 2019 BiOp also states that its "evaluation herein focused on whether the

proposed action could potentially exacerbate competitive interactions between the two species by reducing the availability of NRF habitat[,] . . . if the two species co-occur in the action area," and concludes, "[t]o some extent, these species are co-existing in the action area so we anticipate that competitive interactions between the two species are occurring and are likely to continue and overall outcome of this relationship as a result of the proposed action is uncertain." *Id*. at *00421*. The FY 2019 BiOp expressly does not assess the "outcome" of the barred/spotted owl competition as a result of the BLM's proposed timber harvest, but this effect is "an important aspect of the problem" and as a direct outcome of the action, should have been analyzed by FWS.

The FY 2019 BiOp failed to analyze how eliminating NRF habitat in the action areas—10,459 acres in total—and the associated increase in habitat fragmentation will affect competitive interactions between barred owls and northern spotted owls. The FY 2019 BiOp's justification for concluding that competitive interactions "are occurring and are likely to continue" is insufficient, as it is devoid of any analysis. *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1121 (9th Cir. 2010) ("We cannot defer to a void"). Two district court cases further highlight FWS's failure in the present case.

In *Native Fish Society*, this Court found that the BiOp challenged there failed to consider data regarding historical fish stray rates associated with the use of weirs at hatchery facilities raising non-native salmon in rivers also used by wild ESA-listed salmon runs. 992 F. Supp. 2d at 1112. In particular, this Court faulted

the consulting agency for failing to justify its finding that target stray rates could be attained given uncertainty regarding the efficacy of mitigation measures, ignoring challenges facing the project proponent in reducing stray rates, and failing to analyze whether the target stray rate was adequate to guard against deleterious levels of genetic introgression between non-native hatchery salmon and wild salmon runs. *Id.* at 1112–13. This Court concluded that the consulting agencies ignored these important aspects of the problem and granted plaintiffs summary judgment. *Id.* at 1112, 1116.

In *South Yuba Citizens League*, plaintiffs prevailed in challenging a BiOp for failing to address a number of stressors on salmon species in its analysis of the effects of the operation of two dams on listed salmonids. 723 F. Supp. 2d at 1269. In that case, the Eastern District of California concluded that the BiOp impermissibly ignored four types of stressors where "evidence in the administrative record suggests, to a lay observer, that the issue is one that is 'likely to adversely affect' listed species, and the Federal Defendants have not identified any evidence in the record to the contrary:" impacts from hatchery fish, degraded conditions in the San Francisco Bay Delta, listed salmonid's overall viability, and poaching of listed salmonids. *Id.* at 1270–75. In addition, the court found that the BiOp failed to discuss global warming, on the basis of a study that was not included in the record. *Id.* at 1273–74.

Like the BiOps at issue in *Native Fish Society* and *South Yuba Citizens League*, the FY 2019 BiOp fails to analyze how the action may exacerbate an

existing stressor on a listed species. Though the FY 2019 BiOp acknowledges competitive interactions with barred owls is a stressor on northern spotted owls, and states it will analyze whether the Poor Windy and Evans Creek timber sales will exacerbate this stressor by reducing the availability of NRF habitat, it never actually does so. The FY 2019 BiOp anticipates that competitive interactions between the two species are likely to continue post-logging, but it does not analyze the effects of that competitive interaction on the spotted owl.

Effects to the competitive interactions between spotted owls and barred owls is plainly an important aspect of the problem: it is not insignificant, because a person could meaningfully measure, detect, or evaluate it; nor is it discountable, because a person could expect it to occur. *S. Yuba River Citizens League*, 723 F. Supp. 2d at 1270; *FWS AR 082760–61*. The FY 2019 BiOp's failure to analyze it is arbitrary and capricious, and violates the ESA. *Native Fish Society*, 992 F. Supp. 2d at 1111.

### 2. The BiOp Failed to Analyze Effects on Northern Spotted Owls Partially Outside of the Action Area.

Forty-three northern spotted owl site centers located outside of the Poor Windy and Evans Creek action area have a portion of their home range overlapping the action area. *BLM AR 00370*. Because no treatments are proposed in these home ranges, the FY 2019 BiOp assumes no effects to spotted owls, and excludes them from the action area and the effects analysis. *Id*. at *00370–71*, *437–38*.

However, the mere fact that treatments are not proposed within these spotted owls' home ranges does not exclude the possibility of adverse effects to these

home ranges. 50 C.F.R. § 402.02 ("Effects of the action may occur later in time and may include consequences outside the immediate area involved in the action"). Having identified the action area as including portions of these home ranges, FWS is required to analyze adverse effects to them. *Id.*; *Wilderness Society v. Wisely*, 524 F. Supp. 2d 1285, 1305 (D. Colo. 2007) (the ESA requires analysis of effects that may "spill over" beyond the immediate area involved in the action). Removal and downgrade treatments within the action area but outside of home ranges may adversely affect the foraging and dispersal needs of these 43 spotted owl home ranges, and the 2019 wildfires (see *infra* section V-D) have altered the habitat quality and arrangement across the planning areas and home ranges, thereby affecting spotted owl use of the entire planning area. Effects to the foraging and dispersal needs of these 43 spotted owl home ranges—almost half as many home ranges as are analyzed in the FY 2019 BiOp—is an important aspect of the problem that the BiOp entirely fails to consider.

### 3.    The BiOp Failed to Analyze Effects on Northern Spotted Owls in the Action Area but Outside of Known Home Ranges.

The best available science indicates that northern spotted owls outside of known historic home ranges, often called "floater" owls, are critically important to maintaining overall population viability. *BLM AR 05147*. "Floaters have special significance in spotted owl populations because they may buffer the territorial population from decline." *Id*. Floater owls have been located in at least two locations in the Poor Windy action area. *BLM AR 00416*.

Yet, FWS failed to analyze how the Poor Windy and Evans Creek timber sales may affect floater owls or their habitat. The FY 2019 BiOp focuses its analysis entirely on effects within known home ranges, despite the fact that 2,533 acres of NRF habitat proposed for logging are outside of known spotted owl home ranges and may be occupied or used by floaters. *BLM AR 00397*. With respect to floater owls, the FY 2019 BiOp simply states, without any analysis, that "surveys in the[] project areas will continue and if resident spotted owls are located, the units will be dropped or modified to minimize or avoid adverse effects that lead to a determination of harm." *Id*. at *00416*. Not only does the FY 2019 BiOp fail to analyze how logging outside of home ranges may affect the ability of floaters to buffer the territorial population from decline, but also FWS's apparent suggestion that impacts to floaters can be avoided through surveys is contradicted by the best available science. *BLM AR 05147* (floaters "typically do not respond to hooting as vigorously as territorial birds"). Moreover, the BiOp is required to analyze effects that may not necessarily rise to the level of "harm" and therefore "take." *Compare* 50 C.F.R. § 402.02 (defining "effects of the action") *with* 16 U.S.C. § 1532(19) (defining "take" including "harm"). Even if dropping or modifying units in response to positive survey responses could avert the possibility of "harm" to floater owls, that does not excuse the FY 2019 BiOp's failure to analyze adverse effects to floater owls. Effects to floater owls is an important aspect of the problem that the FY 2019 BiOp failed to consider.

**B.    The BiOp Unlawfully Relies on Measures That Are Not Reasonably Certain to Occur.**

Any measures a BiOp relies on in determining the action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat must constitute a "clear, definite commitment of resources," and be "under agency control or otherwise reasonably certain to occur." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 & n.17 (9th Cir. 2008)). "A 'sincere general commitment to future improvements'—without more specificity—is insufficient." *Id*. (quoting *Nat'l Wildlife Fed'n*, 524 F.3d at 935–36). Rather, "[t]he measures 'must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards.'" *Id*. (quoting *Ctr. for Bio. Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)). "Binding mitigation measures cannot refer only to generalized contingencies or gesture at hopeful plans; they must describe, in detail, the action agency's plan to offset the environmental damage caused by the project." *Id*.

In concluding that the Poor Windy and Evans Creek timber sales are not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat, the FY 2019 BiOp relied on "future development of spotted owl habitat and management of barred owls in the [Late Successional Reserve]" land use allocation to "provide for

territories that will support future spotted owl populations." *BLM AR 00390*, *00394*, *00432*. FWS relies on development (i.e., regrowth) of spotted owl habitat and barred owl control in the Late-Successional Reserve (LSR) land use allocation in three key sections of the FY 2019 BiOp, concerning effects to spotted owls, *id.* at *00394*; habitat, *id.* at *00390*; and critical habitat, *id.* at *00394*.

In light of climate change and the increasing occurrence and intensity of wildfire throughout southwestern Oregon, the future development of spotted owl habitat in the LSR is not reasonably certain to occur. *FWS AR 021596*, *021600–01* (noting uncertainty around the effect of climate change on northern spotted owl habitat, and concluding that pre-existing reserves, as opposed to new reserves, increase in importance under climate change); *cf. id.* at *100018* ("Wildfires, non-native and native invasive species and extreme weather events are the most critical stress factors that climate change will amplify within national forests").

Moreover, the current barred owl control program is only experimental, is not occurring in the Poor Windy and Evans Creek project areas, continued federal appropriations for it are uncertain, and it is unknown when or even if a permanent program will be operational in the region. A permanent barred owl control program is also dependent on future appropriations, and on state and federal permits to "take" barred owls, which may not be granted. *BLM AR 05110* ("barred owls are protected under the Migratory Bird Treaty Act, and [taking them] would require a permit"); *cf. Friends of Animals v. FWS*, 879 F.3d 1000 (9th Cir. 2018) (upholding permit for experimental barred owl control program because it served the "scientific

purposes" of studying the effect of removal on spotted owls), *cert. denied*, 138 S.Ct. 2628 (2018). Therefore, neither spotted owl habitat development in reserves nor barred owl control are reasonably certain to occur or subject to enforceable obligations.

This case is on all fours with *Bernhardt*, where plaintiffs challenged FWS's BiOp concerning federal approval of an offshore oil facility for relying improperly on measures that were not sufficiently specific, binding, or certain to occur. 982 F.3d at 743. The Ninth Circuit found that the measures relied upon were too vague to enforce, not yet authorized, and that the action agency was not truly committed to developing and implementing them despite a "general desire" to do so. *Id.* at 747–48. Because the FY 2019 BiOp relied on these measures in determining no adverse modification of polar bear critical habitat, the Ninth Circuit held the BiOp violated the ESA. *Id.*

Similarly, in *National Wildlife Federation*, the Ninth Circuit held that plans for future structural improvements to aid safe fish passage at spillways "may not be included as part of the proposed action without more solid guarantees that they will actually occur." 524 F.3d 917, 935 (9th Cir. 2008). Despite defendants' assertion that they were "committed to installation" of structural improvements to assist listed fish, the Ninth Circuit was "not persuaded that even a sincere general commitment to future improvements may be included in the proposed action in order to offset its certain immediate negative effects, absent specific and binding plans" to implement those improvements. *Id.* at 935–36. "Although the record does

reflect a general desire to install structural improvements where feasible, it does not show a clear, definite commitment of resources for future improvements." *Id*. at 936. The Court also noted that if "the agencies lack the power to guarantee the improvements in question[,] . . . the proper course is to exclude them from the analysis and consider only those actions that are in fact under agency control or otherwise reasonably certain to occur." *Id*. at 936, n.17.

Here, like *Bernhardt* and *National Wildlife Federation*, the agencies may intend to implement a permanent barred owl control program and expect to develop spotted owl habitat in the LSR over time, but these measures—despite best intentions—are beyond the control of the agencies and uncertain to occur or be effective. In the case of a permanent barred owl control program, this measure is not yet authorized and lacks "solid guarantees that [it] will actually occur." *Bernhardt*, 982 F.3d at 747–78; *Nat'l Wildlife Fed'n*, 524 F.3d at 935. And in the case of developing spotted owl in the LSR, this measure is not certain to occur, its effects are uncertain, and BLM and FWS "lack[s] the power to guarantee the improvements in question." *Bernhardt*, 872 F.3d at 747; *Nat'l Wildlife Fed'n*, 524 F.3d at 936, n.17. These measures "refer only to generalized contingencies or gesture at hopeful plans." *Bernhardt*, 982 F.3d at 743. Because the FY 2019 BiOp relies on these measures in determining no jeopardy and no adverse modification of critical habitat, the BiOp is arbitrary and capricious. *Id*.

**C.    The BiOp's Determination of No Incidental Take is Arbitrary and Capricious.**

In the FY 2019 BiOp, FWS determined that although "spotted owls at 83 sites are likely to be adversely affected" by the Poor Windy and Evans Creek timber sales, including 14 currently occupied sites, "the action will not result of [sic] incidental take because of RMP management direction." *BLM AR 00422*. As a threshold matter, it is entirely unclear what "RMP management direction" the BiOp is referring to, much less how that RMP-level management direction obviates the potential for incidental take. This lack of clarity is itself fatal: "the BiOp does not explain its reasoning such that the agency's 'path may reasonably be discerned.'" *S. Yuba River Citizens League*, 723 F. Supp. 2d at 1279 (quoting *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502 (2009)).

Albeit unclear, the FY 2019 BiOp likely refers to the RMP management direction charging BLM to "not authorize timber sales that would cause the incidental take of northern spotted owl territorial pairs or resident singles from timber harvest until implementation of a [permanent] barred owl management program consistent with the assumptions contained in the Biological Opinion on the RMP has begun." *BLM AR 00991*. If so, FWS puts the cart before the horse. The 2016 RMP prohibits authorizing timber sales that would cause incidental take, but does not state that timber sales would *per se* avoid incidental take by virtue of the fact that timber harvest was planned under the 2016 RMP. Rather, the 2016 RMP requires site-specific consultation to determine whether timber harvest would result

in take: "[w]hether a specific timber harvest would result in incidental take will be determined on a case-by-case basis." *Id.* at *00997*.

FWS's reliance on the 2016 RMP for its conclusion that the Poor Windy and Evans Creek timber sales will not result in incidental take of spotted owls is circular: FWS appears to allege that because the 2016 RMP committed to forgoing incidental take until FWS establishes a permanent barred owl control program, and because that program is not yet operational, the Poor Windy and Evans Creek timber sales will not result in incidental take. In short, BLM does not avoid the potential for incidental take through implementation of the RMP, nor does anything in the 2016 RMP obviate the need for a site-specific analysis of incidental take.

Alternatively, read in context, FWS's no take finding could be read as concluding that incidental take will be avoided because of project design criteria including "appropriate timing restrictions for proposed activities," and that "[i]f spotted owls are located during remaining protocol surveys before the time of on the ground implementation, units would be dropped or modified to eliminate potential adverse effects that could lead to an incidental take determination." *BLM AR 00438*. However, these project design criteria are not incorporated as mandatory "reasonable and prudent measures" or "terms and conditions," because no take is anticipated and only in an ITS can FWS proscribe reasonable and prudent measures or terms and conditions. *Id.* at *00441*. Rather, implementation of the project design criteria is "recommended" as a "discretionary" "conservation recommendation," but these provisions are not obligatory. *Id.* Because the project

design criteria are not reasonably certain to occur, they are illusory and unlawful. *Bernhardt*, 982 F.3d at 743 (measures relied on in a BiOp must constitute a "clear, definite commitment of resources," "under agency control or otherwise reasonably certain to occur[,]" and "subject to deadlines or otherwise-enforceable obligations") (cleaned up).

As described above, the Poor Windy and Evans Creek timber sales may further fragment the already fragmented nature of existing northern spotted owl suitable habitat, exacerbate barred owl encroachment and lead to heightened competitive interactions with barred owl, and cause abandonment of currently occupied spotted owl sites. These threatened effects, which are not considered in the incidental take analysis, cast further doubt over the FY 2019 BiOp's conclusion that implementation of the timber sales will not result in incidental take.

In sum, the FY 2019 BiOp's determination that the Poor Windy and Evans Creek timber sales would not result in incidental take "because of RMP management direction" is circular and is not supported by the record. The FY 2019 BiOp fails to explain why "adverse effects" to 83 sites—including 14 currently occupied sites—does not rise to the level of "harm" and therefore take as defined by the ESA regulations. This failure renders the BiOp and ITS arbitrary and capricious. *S. Yuba River Citizens League*, 723 F. Supp. 2d at 1279; *Ctr. for Biological Diversity*, 422 F. Supp. at 1138.

Moreover, this flaw ripples across the FY 2019 BiOp's jeopardy and critical habitat analyses, where the "no incidental take" determination is used to justify

findings that in turn lead FWS to conclude no jeopardy or adverse modification. *BLM AR 00430* ("demographic support is not expected to be compromised because incidental take of spotted owls are [sic] not anticipated"); *id*. at *00438* (because no incidental take is authorized, "impacts should not resonate to the provincial or range-wide scales"). Because the FY 2019 BiOp predicates its findings of no jeopardy and no adverse modification of critical habitat in part on its unlawful finding of no incidental take, the BiOp's conclusions of no jeopardy and no adverse modification are also arbitrary and capricious. *Turtle Island Restoration Network v. U.S. Dept. of Commerce*, 878 F.3d 725, 738 (9th Cir. 2017) (invalidating a "no jeopardy" conclusion that rested on a flawed premise); *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. 3:10-cv-1129-AC, 2013 WL 1294647, *23–25 (D. Or. Mar. 27, 2013) (same).

### D. Defendants Failed to Reinitiate Formal Consultation in Light of New Information Concerning the 2019 Wildfires.

Under the Endangered Species Act, the BLM and FWS must reinitiate consultation where discretionary federal involvement or control over the action has been retained or is authorized by law, and new information reveals effects of the action that may affect listed species in a manner or to an extent not previously considered. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a)(2); *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008). Although "[w]e do not hold that every modification of or uncertainty in a complex and lengthy project requires the action agency to stop and reinitiate consultation," *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987), "[h]owever, completely new or

unanticipated developments, such as the occurrence of a major forest fire . . . might require the halting of [the project] pending reconsultation and the issuance of a new Biological Opinion," *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1459 (9th Cir. 1992).

In the summer of 2019, the East Evans Creek Fire and Milepost 97 Fire burned a combined 4,831 acres in the planning area just as FWS was completing the consultation process. The fires burned spotted owl habitat at varying intensities, converting suitable habitat to unsuitable habitat, reducing canopy closure below 40%, and affecting spotted owl prey habitat. *BLM AR 00147*. In particular, the Milepost 97 Fire burned 4,706 acres of the eastern edge of KLW-1, which represents the crucial east-west bridge of critical habitat between KLE-2 and KLE-3 to the east, and other subunits to the west of KLW-1. *BLM AR 00034*, *00027* (map of fire and critical habitat subunits). The ability of northern spotted owls to move through this critical habitat bridge is essential for the continued existence of the species. 77 Fed. Reg. 71,931.

Acknowledging the ongoing wildfires in its letter transmitting the FY 2019 BiOp to BLM, FWS stated that "[o]nce the fires have been suppressed, [BLM] and [FWS] will evaluate and record the fire impacts. Depending on the outcome of the evaluation, [BLM] will reinitiate consultation as appropriate." *BLM AR 00326*. Neither FWS nor BLM reinitiated consultation. Instead, the BLM prepared an internal agency memorandum that observed:

> At least one fire has occurred in each of the Evans Creek and Poor Windy Action Areas during the 2019 fire season. The East Evans Creek Fire (125

total acres) was located entirely within the Evans Creek Action Area and 4,706 acres of the Milepost 97 fire (13,094 total acres) was located within the Poor Windy Action Area (Appendix A: Maps 1 and 2). *This represents new information relevant to the proposed action.* The fire severity varied within the Milepost 97 fire (Appendix A: Map 3), which resulted in changes to the spotted owl habitat at the analytical scales evaluated in the consultation (action areas, spotted owl home ranges, 5th field watersheds, and critical habitat sub-units). Fire severity data is not available for the East Evans Creek fire and will not be available in the future because the fire was so small.

*BLM AR 00034* (emphasis added). Although it appears that BLM prepared the memorandum in order to evaluate whether the fires required supplemental environmental review pursuant to the National Environmental Policy Act, FWS provided the memorandum to KS Wild in response to plaintiffs' 60-day notice of intent to sue pursuant to the Endangered Species Act and therefore appears to have adopted its reasoning to support FWS's decision not to reinitiate consultation. *BLM AR 00001–21*. The memo, however, does not support FWS's failure to reinitiate for several reasons.

First, if FWS in fact adopted the BLM's reasoning in the memorandum as its own, then FWS should have immediately reinitiated consultation upon the finding that the fires "represent[] new information relevant to the proposed action." The conclusion that the fires are "new information relevant to the proposed action" is the only finding required to reinitiate consultation. 50 C.F.R. § 402.16(a)(2). In the memorandum, BLM concluded that the wildfires did not rise to the level of *significant* new information for the purposes of the National Environmental Policy Act, but the Endangered Species Act does not utilize "ex-ante standards for determining whether information is "new" or explaining how "new information" will

be evaluated." *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1264–65 (9th Cir. 2017)

(noting that "[t]he "new information" trigger merely requires reinitiation of formal

consultation"). It is through *the reinitiated consultation process* that FWS should

evaluate the new information and issue a new biological opinion disclosing the

effects of the action in light of the new information, not in a memorandum prepared

by the action agency for compliance with a different law. *Pac. Coast Fed'n of

Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, No. Civ.C02-2006-SBA, 2006 WL

798920, at *5 (N.D. Cal. Mar. 27, 2006) (explaining that the reinitiated consultation

process, and not a post-hoc justification, must assess the effects of new information

on listed species and their critical habitat).

Regardless, BLM's memorandum does not actually assess the fires' effects on

the east-west critical habitat bridge between KLW-1 and KLE-2 and whether

spotted owls will be able to successfully move through this bridge. The BLM's

memorandum discusses critical habitat in two paragraphs on page 4, where the

agency states that "the updated proposed action will result in less impacts because

harvest units will be dropped and therefore affect less of the current NRF and

dispersal-only habitat (post-fire) baseline at the critical habitat sub-unit scales

relative to the proposed reduction in the original Assessment (Appendix B, Table

6)." *BLM AR 00037*. While it was appropriate for BLM to drop harvest units in

response to the wildfires, dropping acres is irrelevant to whether owls will continue

to be able to move through the east-west bridge in light of the effects of the wildfire

on owl habitat, the proposed timber harvest that will still occur on BLM land, and

the effects of nonfederal post-fire salvage logging taking place on the intermingled checkerboard across the planning area.[2]

When critical habitat was redesignated in 2012, FWS explained that during consultation, "[t]he first step is to describe the impacts to critical habitat in the action area with respect to the subunit's intended functions as identified in this rule. For example, if a particular subunit was designated to support northern spotted owl connectivity between subunits, then the loss or impact to connectivity must be assessed." 77 Fed. Reg. 71,940. BLM's memorandum does not follow this direction. Instead, the action agency's memorandum focuses on changes to spotted owl habitat generally and does not discuss the critical habitat connectivity function that KLW-1 and KLE-2 provide and for which they were designated as critical habitat, and whether that connectivity function will be compromised as a result of the fires, planned BLM timber harvest, and ongoing nonfederal post-fire logging. *BLM AR 00034–50.*

---

[2] With respect to nonfederal post-fire logging, the memorandum states that "The original consultation assumed some loss of spotted owl habitat on private lands and the habitat loss on state and private lands can be expected to impact spotted owls located within adjacent federal lands. Post-fire salvage will likely occur on private and county lands within the action area, as well as non-discretionary actions of Reciprocal ROW permit holders to remove hazard trees and adjacent trees on BLM lands. Post-fire salvage and hazard tree removal on private lands and federal would likely remove some spotted owl habitat burned in the fire. Requests have already been received and up to 50 acres of habitat may be affected on federally managed lands on the Medford District." *BLM AR 00038.* The effects of these nonfederal actions should be considered when FWS reinitiates consultation. *Marsh*, 816 F.2d at 1387 (new information about cumulative effects—including the effects of future State or private activities—must be considered if consultation is reinitiated).

Second, BLM's memo only discusses spotted owl *dispersal* in light of the wildfires, and not the effect of the wildfires on the *connectivity function* of KLW-1 and KLE-2. The memorandum states that

> Specifically regarding dispersal habitat quality conditions at the 5th field watershed scales, the fires resulted in less than a three percent reduction of dispersal habitat within associated 5th field watersheds. However, even with the loss of habitat from the fires, both watersheds have sufficient habitat remaining that characterizes functional dispersal-habitat connectivity based on best available information (see Opinion pp. 64-66) (i.e., Days Creek-South Umpqua River = 64 percent and Middle Cow Creek = 66 percent).

*BLM AR 00039.* However, the FY 2019 BiOp at 64–66 (*BLM AR 00391–93*) only discusses the "effects to habitat"—i.e., nesting, roosting, foraging, and dispersal habitat—of the proposed BLM timber harvest, and does not discuss *critical* habitat. The FY 2019 BiOp does not discuss "effects to spotted owl critical habitat" until much later in the Opinion beginning at page 96 (*BLM AR 00423*).

The referenced section of the FY 2019 BiOp at pages 64–66 is titled "Effects Due to Removal of Spotted Owl Dispersal-quality Habitat (NRF and Dispersal-only)" and does not discuss connectivity between critical habitat units KLW-1 and KLE-2. *BLM AR 00391–93.* Instead, it observes that "Landscapes with 40 to 50 percent (or more) dispersal-quality habitat are more likely to provide habitat connectivity conducive to spotted owl dispersal. For purposes of this analysis, landscapes, such as fifth-field watersheds and the overall habitat conditions of the action area, are useful scales to evaluate effects on dispersal habitat connectivity."

*Id.* at *00391* (internal reference omitted).[3] While the presence of sufficient dispersal-quality habitat is important, as are the effects of the action on the connectivity of dispersal habitat (i.e., whether habitat exists in a spatial arrangement conducive to juvenile owls leaving the natal nest and finding and colonizing new territories, *BLM AR 00470–71*), this is not the same as whether KLW-1 and KLE-2 continue to provide their connectivity function of critical habitat in the wake of the 2019 wildfires.

Nothing in either FY 2019 BiOp or the BLM's post-hoc memorandum discusses *connectivity* between KLW-1 and KLE-2 as a result of the wildfires, BLM's proposed timber harvest, and nonfederal post-fire logging. Said another way, there may well be (or not) sufficient *dispersal* habitat in the Days Creek and Middle Cow Creek watersheds, but neither the FY 2019 BiOp (because it predates the fire) nor the memorandum discusses the arrangement of that habitat, whether it remains in the crucial east-west bridge, or whether owls will be able to move through the bridge and between critical habitat subunits. The 2019 wildfires represent new information not considered in the FY 2019 BiOp that may affect the northern spotted owl and its critical habitat in a manner or to an extent not previously considered, requiring reinitiation of consultation. 50 C.F.R. § 402.16(a)(2).

---

[3] The fifth-field watersheds for which FWS assessed dispersal-quality habitat are the Days Creek-South Umpqua River and Middle Cow Creek watersheds. *BLM AR 00035.*

## VI.    CONCLUSION

For the forgoing reasons, the court should GRANT Plaintiffs' motion for summary judgment.

Date:  March 30, 2021.                    Respectfully submitted,

*/s/ Sangye Ince-Johannsen*
Sangye Ince-Johannsen (OSB #193827)
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains **10,774** words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Date:  March 30, 2021.                    Respectfully submitted,

*/s/ Sangye Ince-Johannsen*
Sangye Ince-Johannsen (OSB #193827)
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

*Counsel for Plaintiffs*