# EXHIBIT A

with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7411(d); 42 U.S.C. 7429; 40 CFR part 60, subparts B and FFFF; and 40 CFR part 62, subpart A. With regard to negative declarations for designated facilities received by the EPA from states, the EPA's role is to notify the public of the receipt of such negative declarations and revise 40 CFR part 62 accordingly. For that reason, this action:

• Is not a ''significant regulatory action'' subject to review by the Office of Management and Budget under Executive Orders 12866 (58 FR 51735, October 4, 1993) and 13563 (76 FR 3821, January 21, 2011);

• Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);

• Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);

• Does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);

• Does not have federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• Is not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);

• Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);

• Is not subject to requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA; and

• Does not provide the EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

This rule also does not have Tribal implications because it will not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes, as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

The Congressional Review Act, 5 U.S.C. 801 *et seq.,* as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. The EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by June 29, 2021. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

### List of Subjects in 40 CFR Part 62

Environmental protection, Administrative practice and procedure, Air pollution control, Intergovernmental relations, Reporting and recordkeeping requirements, Waste treatment and disposal.

Dated: April 23, 2021.

**David Gray,**

*Acting Regional Administrator, Region 6.*

For the reasons stated in the preamble, the Environmental Protection Agency amends 40 CFR part 62 as follows:

## PART 62—APPROVAL AND PROMULGATION OF STATE PLANS FOR DESIGNATED FACILITIES AND POLLUTANTS

■ 1. The authority citation for part 62 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart T—Louisiana

■ 2. Add an undesignated center heading and § 62.4675 to read as follows:

### Emissions From Existing Other Solid Waste Incineration Units

**§ 62.4675   Identification of plan—negative declaration.**

Letter from the Louisiana Department of Environmental Quality dated November 24, 2020, certifying that there are no incinerators subject to the Other Solid Waste Incineration units (OSWI) Emission Guidelines, at 40 CFR part 60, subpart FFFF, within its jurisdiction in the State of Louisiana.

[FR Doc. 2021–08915 Filed 4–29–21; 8:45 am]

**BILLING CODE 6560–50–P**

---

## DEPARTMENT OF THE INTERIOR

**Fish and Wildlife Service**

**50 CFR Part 17**

[Docket No. FWS–R1–ES–2020–0050; FF09E21000 FXES11110900000 212]

**RIN 1018–BF01**

**Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl; Delay of Effective Date**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule; delay of effective date.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), are delaying the effective date of a final rule we published on January 15, 2021, revising the designation of critical habitat for the northern spotted owl (*Strix occidentalis caurina*) under the Endangered Species Act of 1973, as amended. This second delay is necessary to avoid placing undue risk on the conservation of northern spotted owl caused by allowing exclusions from its designated critical habitat to go into effect while the Service prepares a revision or withdrawal of the January 15, 2021, rule through additional rulemaking to address apparent defects; this second delay is also necessary to avoid confusion and disruption with Federal agencies in the implementation of section 7 of the Endangered Species Act while the Service initiates and completes the rulemaking process for revising or withdrawing the January 15, 2021, rule.

**DATES:** As of April 29, 2021, the effective date of the final rule published January 15, 2021, at 86 FR 4820, and delayed on March 1, 2021 (86 FR 11892), is further delayed until December 15, 2021.

**ADDRESSES:** This final rule is available on the internet at *http://www.regulations.gov* under Docket No. FWS–R1–ES–2020–0050 and at *http://www.fws.gov/oregonfwo.* Comments and materials we received on previous documents related to this rulemaking action, as well as some of the supporting documentation we used in preparing this rule, are available for public inspection at *http://www.regulations.gov* under Docket No. FWS–R1–ES–2020–0050.

**FOR FURTHER INFORMATION CONTACT:** Paul Henson, State Supervisor, U.S. Fish and Wildlife Service, Portland, OR 97030, telephone 503–231–6179. Persons who use a telecommunications device for the deaf (TDD) may call the Federal Relay Service at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

**Background**

On December 4, 2012, we published in the **Federal Register** (77 FR 71876) a final rule designating revised critical habitat for the northern spotted owl. Most of the areas designated as critical habitat are located on Federal lands, with a small amount of State and local government lands included in the designation. No areas of private land were designated. On August 11, 2020, we proposed a rule (85 FR 48487; referred to hereafter as the August 11, 2020, Proposed Rule) to exclude 204,653 acres (82,820 hectares) in 15 counties in Oregon from that revised designated critical habitat pursuant to the Secretary of the Interior's discretionary authority under section 4(b)(2) of the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 *et seq.*), and we solicited public comment on that proposed rule. On January 15, 2021, we published a final rule (86 FR 4820) (referred to hereafter as the January 15, 2021, Final Rule) revising the designated critical habitat for the northern spotted owl by excluding approximately 3,472,064 acres (1,405,094 hectares) in 14 counties in Washington, 21 counties in Oregon, and 10 counties in California. Of the over 3.4 million acres excluded, about 20,000 acres (8,094 hectares) are Federal Indian lands, recently transferred by congressional action to be held in trust for two federally recognized Tribes, and the remainder are Federal lands managed by either the Bureau of Land Management (BLM) or the U.S. Forest Service (USFS).

On March 1, 2021, we issued a final rule delaying the effective date of the January 15, 2021, Final Rule from March 16, 2021, to April 30, 2021, to allow for review of issues of fact, law, and policy raised by that final rule, and we opened a 30-day public comment period on the January 15, 2021, Final Rule, as well as on the potential for an additional delay of the effective date so as to avoid adverse consequences to conservation of the species and to Federal agencies if the exclusions were to go into effect during that rulemaking process (86 FR 11892; referred to hereafter as the March 1, 2021, Delay Rule). On March 5, a lawsuit was filed challenging the March 1, 2021, Delay Rule, *American Forest Resources Council et al.* v. *Williams et al.,* No. 1:21–cv–00601 (D.D.C. March 5, 2021) (*AFRC*). Plaintiffs in that case assert that our March 1, 2021, Delay Rule extending the effective date of the January 15, 2021, Final Rule violates the Administrative Procedure Act (APA; 5 U.S.C. 551 *et seq.*) and the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 (O&C Act; 43 U.S.C. 2601 *et seq.*). The *AFRC* plaintiffs seek implementation of the January 15, 2021, Final Rule without further delay. As of this writing, the *AFRC* plaintiffs have filed a motion for summary judgment, and the Government filed a brief in opposition on April 15, 2021. On March 23, 2021, a lawsuit was filed challenging the January 15, 2021, Final Rule, *Audubon Society of Portland, et al.* v. *United States Fish and Wildlife Service,* No. 3:21–cv–00443 (D. Or., March 23, 2021) (*Audubon*). Plaintiffs in that case assert that the January 15, 2021, Final Rule violates both the APA and the ESA. The *Audubon* plaintiffs request the court vacate the January 15, 2021, Final Rule. As of this writing, briefing has not commenced in that case.

On March 31, 2021, the comment period we opened in our March 1, 2021, Delay Rule closed. Based on the comments received, and other new information, we are extending the effective date of the January 15, 2021, Final Rule from April 30, 2021, until December 15, 2021.

**Public Comments**

As described in our March 1, 2021, Delay Rule, the January 15, 2021, Final Rule raised several questions of law, fact, and policy. We invited public comment on those questions, as well as comments on the impact of the delay of the effective date and any further delay that might be considered. We received a total of 2,237 comments through the comment period that ended March 31, 2021. The comments addressed matters of substantive law and policy under the ESA, as well as under the APA and other laws. These comments raise new issues and, in part, suggest legitimate bases for the litigation challenging the January 15, 2021, Final Rule. During this second period of delay, we will conduct factual and legal research, and address and respond to the substantive comments specific to those issues in a subsequent **Federal Register** publication. We intend to prepare a notice of proposed rulemaking to revise or withdraw the January 15, 2021, Final Rule to address apparent defects that the public comments raised. This includes publishing a proposed rule and seeking public comment. In this rule delaying the effective date, we summarize and respond to the substantive comments that specifically relate to the delay of the January 15, 2021, Final Rule's effective date.

In this section, we identify potential defects in the January 15, 2021, Final Rule based on the comments received and summarize the comments received generally. Comments regarding the impact of delaying the January 15, 2021, Final Rule further, or implementing it now, are addressed in greater detail below under Discussion, as those comments have the most bearing on this final rule.

We received comments that identified potential defects in the January 15, 2021, Final Rule—both procedurally and substantively. In addition, since the publication of the January 15, 2021, Final Rule, our reexamination has identified potential shortcomings of the Final Rule. Potential defects and shortcomings of the January 15, 2021, Final Rule include:

1. That the January 15, 2021, Final Rule was not a logical outgrowth of the proposed rule because among other things it excluded substantially more acres and included new rationales for the exclusions not discussed in the proposed rule.

2. That the January 15, 2021, Final Rule did not utilize the best scientific data available, including from our recent finding that the species warrants reclassification as endangered—that is, that the species is in danger of extinction throughout all or a significant portion of its range—among other new information.

3. That the January 15, 2021, Final Rule failed to address the economic benefits of maintaining the designated critical habitat particularly as to environmental benefits to communities, and thus failed to identify or address the adverse economic costs of the exclusions on these resources.

4. That the January 15, 2021, Final Rule relied upon a large-scale barred owl removal program that is not yet in place and too uncertain to rely on.

5. That the January 15, 2021, Final Rule relied upon a determination by the

Secretary that the exclusions will not result in the extinction of the northern spotted owl, and that the determination was not supported by information in the record and is otherwise inconsistent with the ESA.

6. That the January 15, 2021, Final Rule inadequately explained a change in our prior findings that areas designated on lands managed under the O&C Act were essential to the conservation of the species.

Some commenters supported the January 15, 2021, Final Rule, opposed the delay in its effective date, and sought no further delay in the exclusions from critical habitat. The American Forest Resource Council (AFRC); Lewis and Skamania Counties, Washington; and Douglas County, Oregon, commented that the delay of the effective date is unlawful in that we did not provide the public with notice and an opportunity to comment. These commenters also assert that the Service did not provide a sound rationale for applying the ''good cause'' exceptions to providing notice and the opportunity to comment and for making the Delay Rule effective immediately rather than in 30 days pursuant to 5 U.S.C. 553(b)(3)(B) and (d)(3), respectively. Further, they commented that the Delay Rule fails to address the effects to regulated industry and the public, including AFRC, and delays providing the economic, safety, and environmental benefits of the January 15, 2021, Final Rule. Specifically, AFRC stated that the delay violates the sustained-yield mandate of the O&C Act by placing those areas substantially off-limits for timber harvesting and interferes with fuels reduction projects, thereby increasing the risk of loss of life, property, and habitat. These commenters disputed that a ''logical outgrowth'' problem exists with the January 15, 2021, Final Rule and stated that the changes in that final rule would have been reasonably anticipated by our request for comments in our August 11, 2020, Proposed Rule on additional exclusions we should consider. Additionally, they commented that the January 15, 2021, Final Rule should go into effect immediately because the 2012 final rule was illegal and irrational, citing concerns regarding economic impacts to communities dependent on timber harvest receipts and their assertion that areas of non-habitat were designated in the 2012 final rule.

The Confederated Tribe of the Coos, Lower Umpqua, and Siuslaw Indians (CTCLUSI) supported the revised designation that excluded Tribal lands. The Tribe expressed concern that a delay of the effective date will cause the Tribe to alter its forest management planning efforts due to the current designation of critical habitat on lands conveyed to Tribal management in 2020 from BLM. The CTCLUSI expressed that this action threatens its self-governance and Tribal sovereignty and has economic impacts on the Tribe. The CTCLUSI and Bureau of Indian Affairs expressed that Secretarial Order 3206 should be followed and that it supports the exclusion of the tribally managed lands.

Conservation groups, on the other hand, urged the Service to delay implementation of the January 15, 2021, Final Rule for 240 days until the Service revised or eliminated the rule entirely. In general, most of the comments opposed the exclusions from designated critical habitat determined in the January 15, 2021, Final Rule. Commenters raised concerns about whether the most-current scientific information provides a basis for excluding 3.4 million acres of critical habitat especially given our recent finding that the species warrants reclassification as endangered—that is, that the species is in danger of extinction throughout all or a significant portion of its range. Other comments opposing the exclusions in the January 15, 2021, Final Rule identified concerns given the increased role of the invasive barred owl in competing for the same habitat with northern spotted owls and the impact of recent wildfires in further diminishing available habitat generally. These commenters asserted that the Service should be considering expanding the areas designated as critical habitat, not reducing them. Additionally, commenters expressed concerns about relying on a barred owl removal program to support the exclusions when a large-scale barred owl removal program is likely not feasible; therefore, habitat protections and other recovery actions should remain a priority. One commenter stated that the phrase in the January 15, 2021, Final Rule that ''the Secretary has not concluded that these exclusions will result in the extinction of the species'' is vague, creates uncertainty, and fails to address the declining population of northern spotted owls.

In terms of the process for developing the January, 15, 2021, Final Rule, a few commenters felt the exclusions proposed in the August 11, 2020, Proposed Rule, even though a much smaller and narrower proposal, gave sufficient notice that the final exclusions could be larger and could include areas throughout the range of the owl. Many others strongly disagreed, noting the huge increase in excluded areas, and the expansion beyond just the original proposal of certain BLM-managed lands and Tribal lands in Oregon. The Washington Department of Fish and Wildlife and California Department of Fish and Wildlife also disagreed with the expanded exclusions and commented that they were not aware that exclusions might occur within their States. Commenters also noted that there were entirely new rationales for the final exclusions that were not included in the August 11, 2020, Proposed Rule, and so they had no opportunity to comment on these.

Commenters expressed that the Secretary's statement in the January 15, 2021, Final Rule that timber harvest may occur at longer intervals was speculative and unlikely to occur given current timber harvest practices. Another commenter expressed concern that the excluded areas included northern spotted owl core areas and home ranges, particularly with the BLM Harvest Land Base.

Conservation groups stated that the Service failed to conduct an economic analysis on the critical habitat revision and consider potential adverse economic impacts to communities, especially in relation to the environmental benefits associated with designated critical habitat, and that the Service instead relied on the 2012 economic analysis. These commenters also stated that the Service erred in concluding that the benefits of exclusion outweigh the benefits of inclusion and incorrectly justified its decision in part based on the O&C Act, noting longstanding Department and Solicitor legal interpretations that the designation of critical habitat does not preclude the sustained-yield timber management of O&C lands consistent with the requirements of the O&C Act (77 FR 72010, December 4, 2012). These commenters noted the Service's previous conclusions that the O&C lands and matrix lands significantly contribute to the conservation of the northern spotted owl, that recovery of the owl cannot be attained without the O&C lands, and that our modeling showed that not including many of the matrix lands in the critical habitat network resulted in a significant increase in the risk of extinction.

Conservation groups stated that the Service's conclusion that it may exclude any and all areas from a designation up until the point that doing so would result in the extinction of the species is inconsistent with the ESA in that this perception ignores the vital role that critical habitat plays in the recovery and survival of the species and is not what Congress intended. These commenters

also stated that the January 15, 2021, Final Rule fails to adopt the ''precautionary principle'' and it does not give the species the ''benefit of the doubt'' as the ESA is designed to do.

**Discussion**

Based on the comments received to date, we believe there are sufficient concerns about the merits of the January 15, 2021, Final Rule, as well as the procedural steps we took to issue it, that warrant our further consideration and action. In particular, commenters have asserted that our January 15, 2021, Final Rule failed to consider the best available science in making the requisite finding that the exclusions will not result in the extinction of the species. New information, available after the January 15, 2021, Final Rule was finalized, suggest this may be the case. As noted in the January 15, 2021, Final Rule, our findings regarding the extinction issue were summarized in the rule and further described in a memorandum from the Director to the Secretary (FWS 2021a). That memorandum relied in part on information requested and received from the Service's field office in Oregon, which has the first-line responsibility for managing issues related to the species. The field office, however, upon seeing the final Director's memo, identified areas where the Director's memo was inaccurate or unclear in terms of its characterization of the scientific information and detailed those concerns in a followup memo (see FWS 2021b). Our concerns represented in that followup memo (FWS 2021b) align with the Service's and Department's Code of Scientific and Scholarly Conduct (305 DM 3.2; 212 FW 7), which obligates Service staff to use the ''most appropriate, best available, high quality scientific and scholarly data and information'' to inform sound decisionmaking.

Given the potential errors in the January 15, 2021, Final Rule, as well as concerns that the rule's implementation will hasten the decline of this imperiled species and diminish its prospects for recovery, we have concluded that the January 15, 2021, Final Rule should not become effective before our further review and reconsideration is completed and we have had the opportunity to fully address the issues summarized herein. As discussed further below, to do otherwise risks the removal of that habitat in the interim. Giving the benefit of the doubt to the species when designating critical habitat reflects the institutionalized caution embedded in the ESA, which gives primacy to the protection of listed species. See *Tennessee Valley Authority* v. *Hill,* 437 U.S. 153, 174 (1978) (in enacting the ESA, it is ''beyond doubt that Congress intended endangered species to be afforded the highest of priorities''). Also as discussed below, to allow the exclusions to become effective while we undertake additional rulemaking to revise or withdraw them will cause confusion and disruption with Federal agencies in the ESA section 7(a)(2) consultation process. The comments expressing concern with the delay in the implementation of the January 15, 2021, Final Rule focused in particular on the perceived impacts to timber production from Federal lands and effects that may flow from that. These commenters assert that the 3.4 million acres of exclusions were either appropriate or legally required under the O&C Act, and that further delay will continue to hamper Federal agency efforts to authorize and implement timber harvest on Federal lands. As we noted in the January 15, 2021, Final Rule, we acknowledge this perception of the impact of the critical habitat designation for the northern spotted owl on timber production. However, as noted in our January 15, 2021, Final Rule, ''the implementation of critical habitat occurs within a complex set of factors, including volatility in global demand for wood products, general timber industry transformation, and existing regulatory and statutory requirements, among other factors'' (IEc 2020). See our discussion of economic issues in the January 15, 2021, Final Rule (at 86 FR 4825–4828) and in the December 4, 2012, final critical habitat rule (at 77 FR 71945–71947). Since the species listing itself influences the impacts to timber production, we determine the economic effects that result from the critical habit designation beyond the economic effects that result from listing and other regulations (50 CFR 17.90(a)). The courts have upheld this approach, also referred to as an ''incremental impacts analysis,'' to determine the economic impacts of critical habitat designations (*e.g., Arizona Cattle Growers' Ass'n* v. *Salazar,* 606 F.3d 1160 (9th Cir. 2010)).

Even with the listing of the northern spotted owl and the designation of critical habitat on Federal lands, timber continues to be produced from Federal lands within the areas designated. For example, between 2013 and 2018, the Service completed section 7 consultations on over 100,000 acres (40,469 hectares) of timber sales within the critical habitat designation across Washington, Oregon, and California (USFWS, unpub. data). And, as described in the response to Comment 21(*b*) in the January 15, 2021, Final Rule (at 86 FR 4827), average annual timber harvest on Federal lands in the range of the northern spotted owl has increased significantly in the years after the 2012 critical habitat designation, when compared with such harvest during the preceding decade.

In regard to concerns raised about limitations on fuels management and increased risk of wildfire, in the 2012 critical habitat rule the Service accounted for the drier provinces and parts of the range and recognized that forest management needs to be tailored to the forest type and climatic conditions, including the dry forests in California and the Eastern Washington Cascades. As part of the critical habitat rule, the Service expressly encouraged land managers to consider implementation of active forest management, using ''ecological forestry'' practices, and to restore natural ecological processes where they have been disrupted or suppressed (*e.g.,* natural fire regimes). This flexibility is provided to reduce the potential for adverse impacts associated with commercial timber harvest when such harvest is planned within or adjacent to critical habitat and consistent with land use plans (USDI FWS 2012b: 77 FR 71877, December 4, 2012). The Service recognizes that land managers have a variety of forest management goals, including maintaining or improving ecological conditions where the intent is to provide long-term benefits to forest resiliency and restore natural forest dynamic processes (USDI FWS 2011, p. III–45). The Service has consulted on fuels reduction, stand resiliency, and pine restoration projects in dry forest systems, for example in the Klamath Province of southern Oregon, that promote ecological restoration and are expected to reduce future losses of spotted owl habitat and improve overall forest ecosystem resilience to climate change. We concluded in these consultations that the actions do not adversely modify critical habitat. Many of these treatment areas include reduction in forest canopy to obtain desired silvicultural outcomes and meet the purpose and need of the project. In sum, the critical habitat designation supports and encourages active management of forests to address catastrophic wildfire risk where planned appropriately and informed by the best available science in order to protect communities from property losses, restore forest health, and for the long-term recovery of the owl.

Regarding the impact of a delay on Tribal activities on forest lands, the Service is available to assist Tribes in

developing their forest management plans and any related consultation needs to address management and economic concerns. The Service has been working with the Tribes to address their concerns since the initial proposal to exclude areas from the critical habitat designation, and that has continued through the time of the March 1, 2021, Delay Rule. The Service is committed to upholding Secretarial Order 3206.

Lastly, with regard to comments received that the failure to implement the January 15, 2021, Final Rule precludes the BLM and USFS from implementing their obligations under the O&C Act, as we noted in the January, 15, 2021, Final Rule, there is ongoing litigation challenging BLM's management of O&C lands under the 2016 Resource Management Plans (RMPs) (BLM 2016a, 2016b). One district court has concluded that the 2016 RMPs (including their consideration of the ESA) do not conflict with the O&C Act, see *Pac. Rivers* v. *U.S. Bureau of Land Mgmt.,* No. 6:16–CV–01598–JR, 2019 WL 1232835 (D. Or. Mar. 15, 2019), aff'd sub nom. *Rivers* v. *Bureau of Land Mgmt.,* 815 F. App'x. 107 (9th Cir. 2020). In a separate proceeding, the U.S. District Court for the District of Columbia, in a consolidated set of cases, found that the BLM RMPs violate the O&C Act because BLM excluded portions of O&C timberland from sustained yield harvest (*i.e.,* the BLM allocated some timberlands to reserves instead of the Harvest Land Base); see, *e.g., American Forest Resource Council et al.* v. *Hammond,* 422 F. Supp. 3d 184 (D.D.C. 2019). The parties briefed the court on the appropriate remedy, but the court has not yet issued an order. In the absence of a remedy order or resolution of any further proceedings in that litigation, we decline to speculate on the outcome as a reason to implement the January 15, 2021, Final Rule immediately.

In sum, substantial issues have been raised that our January 15, 2021, Final Rule may be detrimental to the conservation of the northern spotted owl, a species we recently found warrants reclassifying as an endangered species in danger of extinction throughout its range. There are also substantial concerns that we failed to provide the public with adequate notice and opportunity to review and comment on the extent of, and reasons for, the change from our proposed exclusion of approximately 200,000 acres (80,937 hectares) to the approximately 3.4 million acres (1.3 million hectares) excluded by our January 15, 2021, Final Rule. This additional delay to consider these exclusions and conduct rulemaking to either revise or withdraw them will not result in a long-term or irreversible economic impact; timber harvest already scheduled to occur on BLM and USFS land will continue to proceed as planned. We are, therefore, further delaying the effective date of the January 15, 2021, Final Rule that revised the designation of critical habitat for the northern spotted owl to give us the needed time to fully consider questions of law, policy, and fact in regard to that final rule, and allow us to take action to remedy procedural and substantive defects identified in order to provide for conservation of the species and avoid undue disruption in the required consultation process with Federal agencies. The effective date of the January 15, 2021, Final Rule, as modified by the March 1, 2021, Delay Rule (86 FR 11892), was April 30, 2021. With this document, we are delaying the effective date of the January 15, 2021, Final Rule, until December 15, 2021. During this time, we expect to complete our review and reconsideration of the January 15, 2021, Final Rule, and to undertake and complete new notice and comment rulemaking as needed to address the substantive and procedural questions raised.

We note that the Office of Management and Budget deemed the January 15, 2021, Final Rule to be economically significant under Executive Order 12866. However, we do not consider this delay rule to be economically significant.

**Good Cause Under the Administrative Procedure Act**

In our March 1, 2021, Delay Rule, we invited public comments on the impact of the initial delay of the January 15, 2021, Final Rule. We also expressly sought comment on whether we should extend the effective date of the January 15, 2021, Final Rule beyond April 30, 2021, and, if so, for how long and what, if any, the impacts of that delay would be. In addition, we identified the legal authority under which we promulgated it, and we described the subjects and issues involved. As a result, "[f]ormal labels aside, the [March 1, 2021, Delay rule] contained all of the elements of a notice of proposed rulemaking as required by the APA" (*Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania,* 140 S. Ct. 2367, 2384 (2020)). We have now considered and addressed in this final rule the comments regarding the initial delay and the potential impacts of an additional delay. As a result, seeking additional public comment on the delay until December 15, 2021, would be unnecessary and duplicative, and is not required by the APA. It is, therefore, not necessary to assess whether this second delay in the effective date of the January 15, 2015, Final Rule meets the "good cause" exceptions to notice and comment rulemaking of the APA. Nonetheless, out of an abundance of caution, we again review our action here against the good-cause exception. We also in this section evaluate whether we have good cause to make this final rule effective immediately, rather than make it effective in 30 days.

Our implementation of this action extending the effective date of the January 15, 2021, Final Rule from April, 30, 2021, to December 15, 2021, without opportunity for further public comment, effective immediately upon publication in the **Federal Register**, is consistent with the good-cause exceptions provided in the APA. Pursuant to 5 U.S.C. 553(b)(3)(B) and (d)(3), we have determined that good cause exists to forgo the requirements to provide additional prior notice and an opportunity for public comment on this delay in the effective date of the January 15, 2021, Final Rule, and to make this action announcing the delay effective immediately upon publication.

Under the totality of the circumstances presented here, notice and comment would be unnecessary, as well as impracticable and contrary to the public interest, because the public has had notice of and opportunity to comment on further extension of the effective date of the January 15, 2021, Final Rule, and taking the time to provide for additional public notice and comment would thwart the conservation purposes of the ESA, create confusion and disruption for Federal agencies in implementing the ESA section 7(a)(2) consultation process, and prevent the Service from performing its functions.

First, additional notice and comment is unnecessary. As noted above, our March 1, 2021, Delay Rule expressly provided notice that we might further delay the effective date, and also sought public comment on that possibility. We received public comments on that question and considered them in this final rule. As also noted above, this is all that the APA requires. But even if this process did not constitute technical compliance with the APA, and a showing of good cause were required, good cause exists here because further public notice and additional comment is unnecessary given the opportunity provided pursuant to the March 1, 2021, Delay Rule.

Second, additional notice and comment is also impractical and contrary to the public interest. As noted

in our March 1, 2021, Delay Rule (86 FR 11892), we were reviewing whether the determinations made in the January 15, 2021, Final Rule were a ''logical outgrowth'' of the August 11, 2020, Proposed Rule. In addition, there has been substantial litigation in the past on critical habitat designations for this species, and we have now in fact been sued regarding the legality of the January 15, 2021, Final Rule. As identified above, we conclude that there are likely procedural and substantive defects in the January 15, 2021, Final Rule. Our agency's ''due and required'' execution of its functions under the ESA would be unavoidably prevented if we allow the effective date to be triggered without undertaking efforts to address and rectify the defects in the January 15, 2021, Final Rule. *See* S. Doc. No. 248, 79th Cong., 2d Sess. At 200 (1946). That is, if the January 15, 2021, final exclusions from designated critical habitat of more than 3 million acres of northern spotted owl habitat become effective, there is the potential that we will not have met our obligations under the ESA to provide required protections for listed species. Specifically, once the exclusions become effective, Federal agencies will no longer be required to consult with the Service under section 7(a)(2) of the ESA to determine if agency actions will result in the destruction or adverse modification of that formerly designated habitat. Federal agencies could proceed to undertake (or to authorize others to undertake) activities that would remove that habitat before the Service could reconsider whether those exclusions were appropriate in the first place. Because the habitat is defined by forested stands, particularly of older trees, it cannot be replaced for many decades once removed. Even if the January 15, 2021, Final Rule were to become effective only briefly such that immediate implementation of habitat-removal activities would be unlikely or limited, having areas previously designated be excluded, then reconsidered and potentially included again, would cause confusion and disruption in the section 7(a)(2) consultation process, again impeding the Federal agencies from executing their conservation functions, and also affecting third parties reliant on Federal agency activities.

In designated critical habitat for the northern spotted owl in Washington, Oregon, and California, at least 35 separate section 7 consultations have been completed or are underway for ongoing and proposed Federal actions addressing a range of activities— including both forest management to improve fire resiliency and oversee commercial timber harvest. If the 3.4 million acres (1.3 million hectares) were excluded from the critical habitat designation on April 30, 2021, those Federal agencies would no longer be required to address whether the activities destroy or adversely modify the excluded critical habitat and could proceed with such activities. If the Service, following its review of the January 15, 2021, Final Rule, again modifies the exclusions or withdraws them through rulemaking, these Federal agencies would need to reinitiate section 7 consultation to determine if their ongoing activities impact the revised critical habitat, and would be constrained by section 7(d) of the ESA from certain ''irreversible or irretrievable commitment of resources'' during the consultation period. This kind of uncertainty in knowing what areas are within or outside of the critical habitat designation creates project delays that can be avoided by maintaining the status quo of the current designated habitat while the Service reconsiders the January 15, 2021, exclusions.

The ESA does not require exclusion of areas from critical habitat—the authority to exclude particular areas from designations of critical habitat under the second sentence of section 4(b)(2) of the ESA is in the discretion of the Secretary. In contrast, other duties relating to critical habitat are mandatory: The duty for the Service to designate critical habitat (16 U.S.C. 1533(a)(3)) and the duty of Federal agencies to ensure that their actions are not likely to result in the destruction or adverse modification of critical habitat (16 U.S.C. 1536(a)(2)). Therefore, a delay in the effective date of the January 15, 2021, Final Rule excluding areas from critical habitat for the northern spotted owl does not delay compliance with a mandate of the ESA. Delaying the effective date of the January 15, 2021, Final Rule, which purported to exercise that discretionary section 4(b)(2) authority, simply preserves the status quo while we undertake additional review and undertake additional actions as needed to ensure compliance with the legal mandates and conservation purposes of the ESA.

In sum, we find that the totality of the circumstances here—the fact that notice and comment have now occurred with regard to a delay in the effective date of the January 15, 2021, Final Rule; the now-pending judicial review; our concerns about substantive defects in the rule and the associated potential to affect the Service's execution of its statutory functions by having an impact on ESA-listed species; the likelihood of a ''logical outgrowth'' deficiency in the January 15, 2021, Final Rule; and concerns expressed by affected States regarding a lack of opportunity to comment, among other issues—indicate that there is good cause to forgo notice and comment procedures because it is unnecessary, impracticable, and contrary to the public interest for the Service to provide another notice and opportunity to comment on a further extension of the effective date for the January 15, 2021, Final Rule.

We also find that there is good cause to make this rule effective immediately instead of waiting until 30 days after publication for it to become effective. The APA's legislative history indicates that the purpose of the notice requirement at 5 U.S.C. 553(d)(3) is to ''afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take any other action which the issuance of rules may prompt.'' S. Rep. No. 752, 79th Cong., 1st Sess. 201 (1946) and H.R. Rep. No. 1980, 79th Cong., 2nd Sess. 259 (1946). See, *e.g., Riverbend Farms, Inc.* v. *Madigan,* 958 F.2d 1479, 1485 (9th Cir. 1992). However, the APA provides an exception to this 30-day grace period for good cause (5 U.S.C. 553(d)). There is good cause to allow this extension of the January 15, 2021, Final Rule's effective date to go into effect immediately because it preserves the status quo and there is no change to which parties would need time to adjust their behavior. Delaying the effective date provides certainty for the Federal agencies involved in ESA section 7 consultations during the delay period while the Service addresses issues with the January 15, 2021, Final Rule. The Service is committed to ensuring transparency and providing certainty in the adequacy and finality of the January 15, 2021, Final Rule. Thus, it would be contrary to the public interest for the January 15, 2021, Final Rule to go into effect, with its accompanying changes in analyses of impacts, while the January 15, 2021, Final Rule remains under review and subject to revision or withdrawal. The potential for fluctuating between the presence and absence of a requirement for Federal agencies to consult would lead to uncertainty and confusion and a potential and unnecessary increase in administrative costs.

Further, if this rule extending the effective date were itself not to become effective for 30 days, it would mean that the January 15, 2021, Final Rule would go into effect on April 30, 2021. That effective date would create the same issues as discussed in the preceding

paragraphs, *i.e.,* thwart the conservation purposes of the ESA, create confusion and disruption for Federal agencies in implementing the ESA section 7(a)(2) consultation process, and prevent the Service from performing its functions under the Act.

In the March 1, 2021, Delay Rule, the Service anticipated that a second delay might be necessary (see 86 FR 11892). For the reasons stated above, we conclude that we have good cause to issue this final rule, effective immediately, extending the effective date of the January 15, 2021, Final Rule until December 15, 2021.

## References Cited

A list of the references cited in this document may be found at *http://www.regulations.gov* under Docket No. FWS–R1–ES–2020–0050.

## Authority

The authorities for this action are 5 U.S.C. 553 and 16 U.S.C. 1531–1544 unless otherwise noted.

**Martha Williams**

*Principal Deputy Director, Exercising the Delegated Authority of the Director, U.S. Fish and Wildlife Service.*

[FR Doc. 2021–09108 Filed 4–29–21; 8:45 am]

**BILLING CODE 4333–15–P**

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 635

[Docket No. 210422–0085]

**RIN 0648–BI09**

### Atlantic Highly Migratory Species; Modification to the North Atlantic Swordfish and Shark Retention Limits for Certain Permit Holders and Add Inseason Adjustment Authorization Criteria

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** NMFS is adjusting the current regulations for North Atlantic swordfish and shark retention limits for certain permit holders in U.S. Atlantic and Caribbean waters. Specifically, this action will modify swordfish retention limits for highly migratory species (HMS) Commercial Caribbean Small Boat permit holders, Swordfish General Commercial permit holders, and HMS Charter/Headboat permit holders with a commercial endorsement on a non-for-hire (*i.e.,* commercial) trip. This action will also modify the shark retention limits for HMS Commercial Caribbean Small Boat permit holders. Additionally, this action will add regulatory criteria for inseason adjustment of swordfish and shark retention limits for the HMS Commercial Caribbean Small Boat permit. The changes are expected to provide fishermen with greater flexibility, establish greater consistency across regions, and improve the efficiency of swordfish and shark management.

**DATES:** This final rule is effective on June 1, 2021.

**ADDRESSES:** Copies of the supporting documents, including the Final Environmental Assessment (EA), Regulatory Impact Review (RIR), and Final Regulatory Flexibility Analysis (FRFA) for this action, and the 2006 Consolidated Atlantic HMS Fishery Management Plan (FMP) and its amendments are available from the HMS website at: *https://www.fisheries.noaa.gov/topic/atlantic-highly-migratory-species.*

**FOR FURTHER INFORMATION CONTACT:** Nicolas Alvarado at 727–824–5399, Delisse Ortiz at 240–681–9037, or Steve Durkee at (202) 670–6637.

**SUPPLEMENTARY INFORMATION:** Atlantic HMS are managed under the dual authorities of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) and the Atlantic Tunas Convention Act (ATCA). The implementing regulations for the 2006 Consolidated Atlantic HMS FMP and its amendments are at 50 CFR part 635.

### Background

In response to requests from HMS Advisory Panel members and other members of the public, NMFS undertook this rulemaking to provide consistency between the three open access swordfish handgear permits, all of which allow similar gears to be used within U.S. Atlantic and Caribbean waters, and to provide increased fishing opportunities for sharks in the U.S. Caribbean. Overall, this final rule should increase administrative efficiencies and increase management flexibility by managing the swordfish commercial open access permits in the different regions similarly. Additionally, this final rule should improve the efficiency of swordfish and shark management in all regions, while continuing to prevent overfishing.

The proposed rule published on April 27, 2020 (85 FR 23315). The details of this rulemaking can be found in that proposed rule, and are not repeated here. Additional information can be found in the Final EA supporting this action, along with the 2006 Consolidated HMS FMP and its amendments [see **ADDRESSES**].

The comment period for the proposed rule closed on June 26, 2020. NMFS held two public hearings via webinar, and consulted with the HMS Advisory Panel. In addition to the comments received during the webinars and from the HMS Advisory Panel, NMFS received 29 written comments, including comments from the Puerto Rico Department of Natural Resources, Florida Fish and Wildlife Conservation, environmental non-governmental organizations, recreational and commercial fishermen, and the general public. The comments received, and responses to those comments, are summarized below in the Response to Comments section.

After considering the management goals of this final action and public comments, NMFS is adjusting some of the proposed measures. Specifically, for swordfish, this final rule will increase the default retention limit to 18 swordfish per vessel per trip for the HMS Commercial Caribbean Small Boat and Swordfish General Commercial permit holders, and HMS Charter/Headboat permit holders with a commercial endorsement on a non-for-hire (*i.e.,* commercial) trip in all regions except for the Florida Swordfish Management Area, which will remain at 0 swordfish per vessel per trip. This measure is a change from the proposed retention limit of six swordfish per vessel per trip for all regions except for the Florida Swordfish Management Area. For sharks, this rule will establish a default retention limit of three non-prohibited smoothhound sharks, non-blacknose small coastal, or large coastal (other than hammerhead, silky, and sandbar) sharks (combined) per vessel per trip for the HMS Commercial Caribbean Small Boat permit holders. This measure is a change from the proposed default retention limit of three smoothhound and/or tiger sharks (combined) per vessel per trip for the HMS Commercial Caribbean Small Boat permit holders. Lastly, this action will establish inseason adjustment procedures for the HMS Commercial Caribbean Small Boat permit swordfish and shark retention limits. This measure is unchanged from the proposed rule, and will allow NMFS to make inseason adjustments to the retention limits, as is already allowed for other swordfish and shark permits. These final actions are expected to provide fishermen with