IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER; OREGON WILD**; and **CASCADIA WILDLANDS**; | Civ. No. 1:20-cv-00952-AA |
| | **OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| **UNITED STATES FISH AND WILDLIFE SERVICE**; **UNITED STATES BUREAU OF LAND MANAGEMENT**, | |
| Defendants. | |

_____

AIKEN, District Judge:

Plaintiffs are environmental organizations Klamath-Siskiyou Wildlands Center, Cascadia Wildlands, and Oregon Wild.  Plaintiffs challenge under the Endangered Species Act ("ESA") a 2019 Biological Opinion ("BiOp") issued by Defendant Fish and Wildlife Service ("FWS") finding that the Bureau of Land Management ("BLM") proposed timber sales in the Medford District in Oregon were

Page 1 – OPINION AND ORDER

not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of northern spotted owl critical habitat. Plaintiffs further challenge FWS's conclusion that it was unnecessary to authorize any incidental take of northern spotted owls and assert that BLM and FWS violated the ESA by failing to reinitiate consultation to reconsider the effects of the timber projects. Before the Court is Plaintiffs' Motion for Summary Judgment ("MSJ"), ECF No. 17, and Defendants' Cross-Motion for Summary Judgment ("Cross-Mot."), ECF No. 18. For the reasons explained, Plaintiffs' Motion for Summary Judgement, ECF No. 17, is GRANTED in part and DENIED in part. Defendants' Cross Motion for Summary Judgment, ECF No. 18, is GRANTED in part and DENIED in part.

## STATUTORY BACKGROUND

## I.   The Endangered Species Act

### A.   *History*

Congress enacted the Endangered Species Act ("ESA") in 1973 in order "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). Congress further declared its policy that all federal agencies "shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance" of the ESA's purposes. 16 U.S.C. § 1531(c). The ESA obligates federal agencies "to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).

**B.**    *Citizen Enforcement*

The ESA contains a citizen suit provision under which individuals may file suit "to enjoin any person, including the United States . . . , who is alleged to be in violation of any provision of" the ESA.  16 U.S.C. § 1540(g)(1)(A).  That provision contains a notice requirement mandating that "no action may be commenced . . . prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation."  *Id*. § 1540(g)(2)(A).

**C.**    *Critical Habitat Designation*

Section 4 of the ESA requires the U.S. Fish & Wildlife Service ("FWS") to "designate any habitat" of a listed species that is "considered to be critical habitat." 16 U.S.C. § 1533(a)(3).  The ESA defines critical habitat as "the specific areas within the geographical area occupied by the species, at the time it is listed[,] . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection[.]"  16 U.S.C. § 1532(5)(A)(i).

**D.**    *Consultation Requirement*

The Secretary of Interior, through FWS, administers the ESA for the spotted owl.  Section 7(a)(2) of the ESA directs each agency to ensure, in consultation with FWS, that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or "destr[oy] or adverse[ly] modif[y] a species' designated critical habitat."  16 U.S.C. § 1536(a)(2). Section 7 "reveals a conscious decision by Congress to give endangered species

priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth.*, 437 U.S. at 185.

At the conclusion of a formal Section 7 consultation, FWS issues a Biological Opinion ("BiOp") in which it sets forth its conclusion as to whether the proposed action[1] avoids "jeopardy" and "adverse modification." 16 U.S.C. § 1536(b)(3)(A). The BiOp must be based on the "best scientific and commercial data available." *Id.* § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8). "[F]ailure to do so violates the APA." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). The purpose of the "best scientific and commercial data" standard is to ensure a BiOp is not based on "speculation and surmise." *Id.* (citing *Bennett v. Spear*, 520 U.S. 154, 176 (1997)); *see also Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1127 (N.D. Cal. 2006) ("To the extent that there is any uncertainty as to what constitutes the best available scientific information, Congress intended 'to give the benefit of the doubt to the species.'") (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).

Once FWS has determined that an action is not likely to "jeopardize" a listed species or result in the destruction or adverse modification of its critical habitat, it must determine whether an action is likely to result in any "incidental take" of endangered or threatened species. "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect . . . ." 16 U.S.C. § 1532(19). "Harming a

---

[1] For purposes of the ESA, "action" is defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02.

species may be indirect, in that the harm may be caused by habitat modification, but habitat modification does not constitute harm unless it 'actually kills or injures wildlife.'" *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 924-25 (9th Cir. 2000). "[H]abitat modification that is reasonably certain to injure an endangered species by impairing their essential behavioral patterns satisfie[s] the actual injury requirement . . . ." *Id.* at 925 (citing *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781,783 (9th Cir. 1995)). If FWS determines that an action "is reasonably certain" to result in an incidental take of that species, it must issue an incidental take statement ("ITS"). 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7).

The ITS must specify the impact of the incidental taking; specify reasonable and prudent measures that are necessary or appropriate to minimize such impact; and set forth the terms and conditions that the agency or third party must comply with in order to implement specified reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(C).

### E.    *Reinitiation of Consultation*

When an agency retains discretionary involvement or control over an action, it is required to request "[r]einitiation of consultation . . . [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2).

## II.    The Northern Spotted Owl

The Northern Spotted Owl (*Strix occidentalis caurina*) is a medium-sized dark brown owl, with a barred tail, white spots on the head and breast, and dark brown

eyes surrounded by prominent facial disks. *Revised Critical Habitat for the Northern Spotted Owl: Final Rule*, 77 Fed. Reg. 71,876, 71,883 (December 4, 2012), available at FWS AR 000720.

### A.    *Nesting, Roosting, and Foraging ("NRF") Habitat*

The spotted owl occupies old-growth forest habitat in the Pacific Northwest, from southern British Columbia in the north to Marin County, California in the south. *Id*. at 71,883–84. The spotted owl relies on older forest habitats because these forests generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. *Id*. at 71,884. These structures include a multi-layered and multispecies tree canopy dominated by large overstory trees; a moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. *Id*. Forested stands with high canopy closure also provide thermal cover and protection from predation. *Id*. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat. BLM AR 01668.

### B.    *"Dispersal" Habitat*

Northern spotted owls also require habitat to "disperse" to new territories. The FY 2019 BiOp explains that:

> Natal dispersal of spotted owls typically occurs in September and October with a few individuals dispersing in November and December. Natal dispersal occurs in stages, with juveniles settling in temporary home ranges between bouts of dispersal . . . . Dispersing juvenile spotted owls experience high mortality rates, exceeding 70 percent in some studies. Known or suspected causes of mortality during dispersal

include starvation, predation, and accidents[.] Successful dispersal of juvenile spotted owls may depend on their ability to locate unoccupied suitable habitat in close proximity to other occupied sites[.]

Dispersal can also be described as having two phases: transience and colonization. Fragmented forest landscapes are more likely to be used by owls in the transience phase as a means to move rapidly between denser forest areas. Movements through mature and old growth forests occur during the colonization phase when birds are looking to become established in an area. Transient dispersers use a wider variety of forest conditions for movements than colonizing dispersers, who require habitats resembling nesting/roosting/foraging habitats used by breeding birds. Dispersal success is likely highest in mature and old growth forest stands where there is more likely to be adequate cover and food supply.

BLM AR 00470–71 (internal references omitted).

## C.    *Home Range, Activity Centers, and Core Use Areas*

Northern spotted owl site occupancy is defined as "locations with evidence of continued use (including breeding), repeated location of a pair of single birds, presence of young before dispersal, or some other strong indication of continued occupancy." FWS AR 00505. FWS determined spotted owl sites based on "historic information, recent protocol surveys, incidental observations, or a combination thereof." *Id.* A spotted owl site is the defined circle area representing an approximation of a "home range." *Id.*

Spotted owls "forage over a wide area and subsequently return to a nest or roost location that is often centrally-located within the home range." BLM AR 06335. This central location is referred to as an "activity center." *Id.* "An area of concentrated use within a home range that receives disproportionately high use, . . .

commonly includ[ing] nest sites, roost sites, and foraging areas close to the activity
center" is referred to as a "core use area." *Id.* (internal references omitted).

### D.    *Species Listing and Designation of Critical Habitat*

FWS listed the northern spotted owl as a threatened species under the ESA in
1990. *Determination of Threatened Status for the Northern Spotted Owl*, 55 Fed. Reg.
26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).   In late 2020, FWS found
that uplisting the northern spotted owl to endangered species status is "warranted
but precluded by higher priority actions" due to continued habitat loss and
competition with the invasive barred owl. *12-Month Finding for the Northern Spotted
Owl*, 85 Fed. Reg. 81,144 (Dec. 15, 2020).

Critical habitat was designated for the species in 1992 and revised in 2008 and
2012.  77 Fed. Reg. at 71,876.  FWS recently reduced spotted owl critical habitat by
excluding approximately 3.5 million acres on federal lands pursuant to a settlement
agreement with the timber industry.  *Revised Designation of Critical Habitat for the
Northern Spotted Owl*, 86 Fed. Reg. 4,820 (Jan. 15, 2021).

The 2012 Critical Habitat Rule designated eleven critical habitat units
("CHUs") and sixty subunits across the range of the species. 77 Fed. Reg. at 71,876.
The conservation role of spotted owl critical habitat "is to adequately support the life-
history needs of the species to the extent that well-distributed and interconnected
northern spotted owl nesting populations are likely to persist within properly
functioning ecosystems at the critical habitat unit and range-wide scales."  *Id*. at
71,938.  The critical habitat network allows owls to move between designated critical

habitat units. In designating critical habitat for the species in 2012, FWS explained that spotted owl population growth "can only occur if there is adequate habitat in an appropriate configuration to allow for the dispersal of owls across the landscape." *Id.* at 71,906.

In establishing the critical habitat network in 2012, FWS observed that "[s]pecial management considerations or protection are required" for the Klamath West 1 ("KLW-1") subunit of the Klamath West CHU and the Klamath East 2 ("KLE-2") subunit of the Klamath East CHU, in order "to address threats to the essential physical or biological features from current and past timber harvest, losses due to wildfire and the effects on vegetation from fire exclusion, and competition with barred owls." *Id.* at 71,931, 71,934. KLW-1's functions include demographic support to the overall spotted owl population and for north-south and east-west connectivity between critical habitat units and subunits and sits at the western edge of an important spotted owl connectivity corridor between coastal Oregon and the western Cascades. *Id.* at 71,931; BLM AR 00138.

The purpose of KLE-2 is to provide demographic support and east-west connectivity between critical habitat units and subunits, facilitating northern spotted owl movements between the western Cascades, coastal Oregon, and the Klamath Mountains. *Id.* at 71,934. All forests within KLW-1 and KLE-2 are "essential for the conservation of the species." *Id.* at 71,931, 71,934.

### E.    *Effect of Barred Owl on Spotted Owl*

Barred owls (*Strix varia*) are native to North America, but only recently

arrived in the Pacific Northwest.  BLM AR 010152.  Barred owls are slightly larger and more aggressive than spotted owls and compete for similar habitat.  *Id*.  A primary reason why barred owl incursion poses such a grave threat to northern spotted owl survival and recovery is that barred owls outcompete northern spotted owls across habitat classes, while adapting to inferior habitat more readily than northern spotted owls.  BLM AR 04567.  There exists "a strong potential for both exploitation and interference competition between spotted owls and recently established barred owls . . . ." *Id*. The "availability of old forests and associated prey species are likely to be the most strongly limiting factors in the competitive relationship between these species[,]" and so "maintaining high-quality habitat in late-successional forests" is important for the persistence of northern spotted owls. *Id*.

FWS is engaged in an experimental control program for barred owls involving lethal removal of the invader.[2]  A portion of the experimental control program, the Union/Myrtle (Klamath) Study Area, is near the Poor Windy and Evans Creek timber sales.  BLM AR 04963 (study area description), BLM AR 04965 (study area map); FWS AR 019670 (regional map).  A permanent control program is intended to be

---

[2]  FWS, Barred Owl Study Update, available at https://www.fws.gov/ oregonfwo/articles.cfm?id=149489616 (announcing decision to continue the barred owl removal experiment through August 2021).

implemented beginning sometime between 2021 and 2023.  BLM AR 01815.

FWS determined that retaining both occupied northern spotted owl sites and unoccupied, high-value northern spotted owl habitat across the spotted owl's range are key components for recovery. 77 Fed. Reg. at 71,879; BLM AR 06147–48.  The 2011 Northern Spotted Owl Recovery Plan states: "Because spotted owls on established territories are likely to be more successful if they remain in those locations, managing to retain spotted owls at existing sites should be the most effective approach to bolstering the demographic contribution of a habitat conservation network and the highest priority for land managers."  BLM AR 06148 (internal references omitted).  Recovery of the northern spotted owl depends on the retention of all suitable habitat in the near term, development of suitable habitat in the longer term, and successful barred owl control.  *Id*. at 06148.

## III.   Factual Background

The Biological Opinion at issue in this case is catalogued in the Administrative Record at FWS AR 000495-709 and BLM AR 00324-538.  For clarity, this opinion refers to the internal pagination of the BiOp.  The Poor Windy and Evans Creek action areas (referenced herein as "the timber projects") are located within BLM-managed lands in BLM's Medford District.  BLM AR 00726.  The Poor Windy project consists of 14,076 acres and the Evans Creek project consists of 1,920 acres. Approximately 10,459 acres of spotted owl NRF habitat is proposed for treatment, accounting for 2.9 percent of NRF habitat in the District.  BiOp at 61.

Because the timber projects occur within land designated spotted owl critical habitat, on May 30, 2019, BLM submitted a Biological Assessment for its FY 2019 "Batch of Projects" to FWS, analyzing the projects' impacts on the spotted owl. BLM AR 00722-816. Based on its analysis, BLM concluded that the Poor Windy and Evans Creek projects "may affect, and are likely to adversely affect spotted owls and their designated critical habitat." BLM AR 00722. In light of this conclusion, BLM commenced formal consultation with FWS under Section 7 of the ESA. *Id*.

Following formal consultation, On August 7, 2019, FWS issued the 2019 BiOp Plaintiffs challenge in this case, addressing BLM Medford District's FY 2019 Batch of Projects.

The Court discusses the BiOp in greater detail below, but to summarize, the BiOp analyzed: (1) the status of the spotted owl species (evaluating its range-wide condition, the factors responsible for that condition, and its survival and recovery needs); (2) the spotted owl's environmental baseline (evaluating its condition in the action area, the factors responsible for that condition, and the relationship of the action area to the survival and recovery of the species); (3) the effects of the proposed action on the spotted owl (evaluating the direct and indirect impacts of the action and the effects of any interrelated or interdependent activities on the species); and (4) cumulative effects on the spotted owl (evaluating the effects of future, non-Federal activities in the action area). BiOp at 32.

FWS concluded, "[a]fter reviewing the current status of the spotted owl and its critical habitat, the environmental baseline for the action area, the effects of the

proposed action and cumulative effects, it is the Service's biological opinion that the action, as proposed, is not likely to jeopardize the continued existence of the spotted owl, and is not likely to destroy or adversely modify spotted owl critical habitat." BiOp at 110.  FWS explained that it reached that conclusion after determining that 90 percent of spotted owl NRF habitat in the action area will be retained in a functional condition on the landscape and that only 10 percent of NRF habitat will undergo a loss or downgrade.[3]  BiOp at 110.  FWS stated that "[a]lthough the loss or downgrade of 10 percent of existing NRF habitat is certainly an adverse effect to the spotted owl, the proposed action was specifically designed to disperse habitat impacts on the landscape in a manner that avoids take of spotted owls, enhances the resiliency of remaining stands of NRF habitat in the action area to wildfire, and retains the capability of NRF habitat in the action area to support the life history requirements of the spotted owl."

The BiOp also discussed the threat of wildfire, concluding that it "has become a more significant threat to spotted owls and their habitat in this portion of its range due to higher than natural fuel-loading following decades of fire suppression and the warming and drying effects of climate change. BiOp at 112.  Land management actions that enhance forest stand resiliency to wildfire; retain functional NRF habitat; and avoid take should benefit the conservation of the spotted owl.  *Id*. Therefore, the BiOp explained that spotted owl population impacts "are not expected

---

[3]    The term "downgrade" signifies that the proposed treatments may have a negative influence on the quality of affected spotted owl habitat by removing or reducing habitat elements that support spotted owl life history requirements.  BiOp at 59.

to resonate at the range-wide level.  As a result, the proposed action is not expected to jeopardize spotted owls at the range-wide scale where the jeopardy determination is made.

In its letter to BLM transmitting the 2019 BiOp, FWS noted that at the time the BiOp was being prepared, the "Milepost 97 wildfire near Canyonville, OR and the Evans Creek fire near Medford, OR were . . . actively burning."   FWS AR 000497. FWS indicated that, once the fires were suppressed, the agencies would evaluate the fire impacts and, "[d]epending on the outcome of the evaluation, [BLM] will reinitiate consultation as appropriate."   FWS AR 000497.  The Evans Creek Fire and the Milepost 97 fire are discussed in greater detail later in this opinion.

Following FWS's BiOp, On May 29, 2020, Plaintiffs notified FWS and BLM that the agencies are required to reinitiate consultation under Section 7(a)(2) of the ESA, in order to consider new information, concerning 2019 forest fires, revealing effects of the action in a manner and to an extent not considered in the 2019 BiOp, pursuant to 50 C.F.R. § 402.16(a)(2).  FWS AR 00022.

On June 12, 2020, Plaintiffs filed the initial Complaint in this lawsuit.  ECF No. 1.  In their Complaint, Plaintiffs asserted three claims against FWS, alleging violations of the ESA and APA, asserting: (1) that FWS failed to "consider important aspects of the problem" in the FY 2019 BiOp, Compl. at 17-19 (First Claim for Relief); (2) that FWS "improperly relied on conservation measures not reasonably certain to occur" in the FY 2019 BiOp, *Id.* at 19-20 (Second Claim for Relief); and (3) that "FWS's

failure to authorize incidental take for the Poor Windy and Evans Creek timber sales is arbitrary and capricious.*" Id.* at 20-21 (Third Claim for Relief).

On July 17, 2020, FWS and BLM responded to Plaintiffs' notice letter, asserting the agencies' position that re-initiation of formal consultation was not required. The 60-day notice period, required before commencing suit for failure to reinitiate formal consultation under 16 U.S.C. § 1540(g)(2), concluded on July 28, 2020. FWS and BLM did not reinitiate formal consultation concerning the Poor Windy and Evans Creek timber sales. Plaintiffs filed the First Amended Complaint ("FAC"), reasserting three claims as in the original Complaint and adding a Fourth Claim for Relief, alleging that "BLM and FWS failed to reinitiate formal consultation in light of new information concerning the 2019 Milepost 97 and East Evans Creek fires." FAC at 26-28 (Fourth Claim for Relief).

Now, Plaintiffs move for Summary Judgment on all claims, and Defendants moved for Cross-Summary Judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Judicial review of agency actions under the ESA is governed by the APA. 5 U.S.C. § 706; *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In determining whether an agency decision is arbitrary and capricious, courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). A decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm.*, 92 F.3d 940, 942 (9th Cir.1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The arbitrary and capricious standard is deferential, but it does not shield agency decisions from a "thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). FWS must articulate "a rational connection between the facts found and the conclusions made." *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). It is not entitled to deference where its conclusions "do not have a basis in fact." *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1236 (9th Cir. 2001). An agency's decision can be upheld only on the basis of the reasoning found in that decision; the reviewing court cannot substitute reasons for agency action that are not in the record. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997). Rationales for agency decision-making appearing for the first time in litigation are post hoc explanations that cannot be used to justify agency action. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049–50 (9th Cir.

2010) (internal citation omitted).

## DISCUSSION

Plaintiffs move for summary judgment on all claims.  First, Plaintiffs assert the 2019 BiOp fails to analyze effects of the Poor Windy and Evans Creek timber sales on the spotted owl.  Second, Plaintiffs maintain that the BiOp unlawfully relies on measures that are not reasonably certain to occur—specifically, the measures to reduce the presence of the barred owl.  Third, Plaintiffs contend that the BiOp's determination of "no incidental take" is arbitrary and capricious.  Finally, Plaintiffs allege that Defendants failed to reinitiate formal consultation as required by the ESA in light of new information concerning the 2019 wildfires.

In its Cross Motion for Summary Judgment, Defendants attack the merits of all Plaintiffs' claims and further counter that Plaintiffs' second claim is barred by claim preclusion and that Plaintiffs' fourth claim is barred because Plaintiffs failed to provide the notice required under the ESA.  The Court addresses the parties' arguments in turn.

## I.    Whether the BiOp Failed to Analyze Effects of the Poor Windy and Evans Creek Timber Sales on the Northern Spotted Owl

Plaintiffs argue that the BiOp is "arbitrary and capricious" because it "entirely failed to consider an important aspect of the problem" concerning the effects of the timber sales on the spotted owl.  MSJ at 19; *see Motor Vehicle Mfrs.*, 463 U.S. at 43. In the context of the ESA, the "problem" is whether a proposed project will cause jeopardy to a listed species and "any effect that is likely to adversely affect the species is plainly an important aspect of this problem."  *Native Fish Soc. v. Nat'l Marine*

*Fisheries Servs.*, 992 F. Supp. 2d 1095, 1111 (D. Or. 2014) (quoting *S. Yuba River Citizens League v. NMFS*, 723 F.Supp.2d 1247, 1270 (E.D.Cal.2010).

### A.    Effects of Habitat Removal and Downgrade on the Barred Owl's Competitive Advantage

Plaintiffs contend that the 2019 BiOp failed to analyze how eliminating NRF (nesting, roosting, foraging) habitat in the action areas and the associated increase in habitat fragmentation[4] will affect competitive interactions between barred owls and northern spotted owls.  MSJ at 27.  Plaintiffs assert that, though the 2019 BiOp acknowledges competitive interactions between the two birds, it fails to analyze whether the timber sales will exacerbate this stressor by reducing the availability of habitat.  MSJ at 29-30.

Defendants respond that the BiOp thoroughly analyzes the potential influence of barred owls in conjunction with its assessment of the effects of the proposed action on spotted owls.  Cross-Mot. at 36.  Defendant's point out that, while the BiOp arrived at a conclusion of scientific uncertainty, "the fact that FWS recognizes an uncertain outcome does not mean that FWS entirely failed to consider an important aspect of the problem."  Rather, FWS reached this conclusion based on a full consideration of "the best scientific and commercial data available," as required by the ESA.  Cross-Mot. at 38; 50 C.F.R. § 402.14(g)(8); 16 U.S.C. § 1536(a)(2).

Reviewing the BiOp, FWS identifies competition from the barred owl as one of the primary threats to the spotted owl.  BiOp at 45.  Citing to scientific studies, the

---

[4]    Plaintiffs do not develop argument related to "habitat fragmentation" or its effect on spotted owls.  Accordingly, the Court does not discuss habitat fragmentation.

BiOp notes that such evidence "suggests that the presence and distribution of barred owls may affect habitat quality for (and use by) spotted owls." BiOp at 93. The BiOp states that the research "suggest[s] that the two species compete for resources[,]" and that "maintaining older, high quality forest habitat may help spotted owls persist." *Id*. The BiOp acknowledges that "[t]o date, there are no known forest conditions where spotted owls have a competitive advantage over barred owls." While uncommon, "spotted owls and barred owls occupy[ ] the same territories concurrently, and such was observed in the action area." BiOp at 94. From those points, FWS highlighted the threat posed by barred owls to spotted owls in the proposed action area.

FWS factored in to its analysis that the proposed project "includes the removal and downgrade of spotted owl NRF habitat[,] but that, within the total action area, "90 percent of the NRF . . . will be retained." BiOp at 94. The BiOp cited to the Revised Recovery Plan for the Spotted Owl (USDI FWS 2011), noting that the "intent" of the plan, followed by BLM, is "to conserve the older and more structurally complex multi-layered conifer forests on federal lands in order to not further exacerbate the competitive interactions between spotted owls and barred owls." However, the BiOp also noted that "barred owls are habitat generalists," and that, just like spotted owls, they too "select for older, more structurally complex forest stands." BiOp at 94.

The BiOp considered specific actions proposed for the project areas, such as "thinning," which includes reduction in the density or uniformity of pole-sized Douglas firs. BiOp at 67. FWS explained how the "intensity of mechanical treatment

influences the degree of change to habitat suitability[,]" stating that "heavier treatments in NRF habitat, such as removal, and to some extent variable density thinning, have a higher likelihood of negatively affecting spotted owls due to the reductions in cover and structural complexity." Regarding the effect of the proposed treatment on the relationship between the barred and spotted owl with respect to habitat availability, the BiOp states that "there is some uncertainty regarding the response of the spotted owls to these types of treatments . . . especially at the scale proposed, along with the combined or additive effect of the presence of barred owls in this landscape." The BiOp notes that "competitive interactions between the two species are occurring and are likely to continue and overall outcome of this relationship as a result of the proposed action is uncertain." BiOp at 94.

Despite its determination that habitat reduction negatively affects the spotted owl in terms of its competition with the barred owl, the BiOp stated that availability of alternative untreated habitat can reduce the likelihood that treatment would negatively affect spotted owls. BiOp at 69-70. The BiOp discussed geographical information involving both owls' overlapping ranges, and stated that alternative habitat availability will help reduce "interference competition" to the spotted owl from barred owls:

> "Barred owls are documented in the action areas (Table 10). Based on best available research, in areas where the two species co-occur, individual spotted and barred owls in adjacent territories were found to have overlapping home ranges, but overlapping use areas were largely restricted to broader foraging areas in the home range with minimal spatial overlap among core use areas (internal citations removed). Authors found overall similar patterns of habitat use in that ***both species selected old forest for foraging*** but differences in roosting

was noted where barred owls selected a broader range of habitat types and spotted owls relied more on older forests. Despite the potential for overlap, the number of movements (expressed as a proportion of occupied sites) has steadily increased for non-juvenile spotted owls, as *barred owl densities have increased*, *suggesting disruptions in the spotted owl's connection or fidelity to their territory* (citations removed). *Barred owls likely out-compete spotted owls for resources* (citations removed) and could influence major changes in the trophic structure of local resources (internal citations removed). Considering these potential changes to prey and observed responses of spotted owls to barred owls, *we are uncertain how spotted owls in the action area will use the habitats* or where they may be in future years, but *we assume that the availability of untreated habitat in the action area ameliorates or can potentially offset the negative influence of barred owls* (citations removed). The largest blocks of untreated habitat retained in this landscape can potentially provide a place for spotted owls to occupy."

BiOp at 70 (emphasis added).

The Court finds that the BiOp cites to scientific studies which conclude—without exception—that barred owls "out-compete" spotted owls. BiOp at 94 (stating that "[t]o date, there are no known forest conditions where spotted owls have a competitive advantage over barred owls.") The BiOp also declares that FWS anticipates those "competitive interactions" to continue. BiOp at 94. Further, FWS cites to studies finding that, while barred owls are "habitat generalists," they also compete for the same habitat critical to spotted owl persistence: "older, more structurally complex forest stands." BiOp at 70.

The evidence outlined in the BiOp shows that barred owls out-compete spotted owls for NRF habitat with no known exception, and that NRF habitat will be reduced by the proposed projects. Further, that barred owls' competitive interactions with the spotted owl are "anticipate[d] to continue" within the action area. Yet, after

analyzing those points, FWS concludes that "the outcome of this relationship [between the two owl species] as a result of the proposed action is uncertain." That strikes the Court as a conclusion "counter" to the evidence on which FWS relied. As further example, the BiOp determined that alternative habitat availability will help reduce interference competition, but in the same examination, FWS discussed studies showing that when barred owls and spotted owls overlap—behavior that is known to happen in the action area—"disruptions in the spotted owl's connection or fidelity to their territory" occurs partly because barred owls select a "broader range" of habitat, and that "barred owl densities . . . increase." Despite that, the BiOp continues: "we assume that the availability of untreated habitat in the action area ameliorates or can potentially offset the negative influence of barred owls." But the BiOp does not sufficiently explain the basis for that assumption.

The Court finds that, on this record, the BiOp did not "entirely fail to consider" an important aspect of the problem—that is, the BiOp considered whether the proposed project will cause jeopardy to the spotted owl in relation to its competition with the barred owl for habitat. The Court also finds, however, that in considering the problem, the BiOp "offered an explanation for its decision that runs counter to the evidence before the agency," *O'Keeffe's, Inc.*, 92 F.3d at 942; *Motor Vehicle Mfrs.*, 463 U.S. at 43. As such, the Court concludes that the determination on the effects of the action on the barred owl and spotted owl interaction is arbitrary and capricious.

In offering an explanation counter to the evidence after considering important aspects of the problem, FWS ultimately minimized the effect of the action and its

conclusions are not supported by the evidence.  *See Native Fish Soc. v. Nat'l Marine Fisheries Servs.*, 992 F. Supp. 2d 1095, 1112 (D. Or. 2014) (finding that though the agency did not "entirely" ignore the problem, it minimized it, leading the court conclude the problem had been ignored).

The Court agrees with Defendants that scientific uncertainty, on its own, does not mean that FWS "entirely failed to consider an important aspect of the problem." Cross-Mot. at 38; *see San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 610 (9th Cir. 2014) (finding that the court's "deference to agency determinations is at its greatest" when the agency is faced with scientific uncertainty and must choose its analytical approach in light of the uncertainty).  However, FWS was not faced with scientific uncertainty, but unanimity concerning the negative impact of reduced NRF habitat and the barred owls' threat to the spotted owl based on the barred owls' ability to out-compete for food and shelter.

Plaintiffs have met their burden to show that the BiOp failed to analyze an important aspect of the problem: the effect of habitat loss on the competitive interactions between the barred and spotted owl.  The agency's assumption that the availability of untreated habitat in the action area will ameliorate the negative influence of barred owls and its explanation on this issue is arbitrary and capricious and violates the ESA.  *See Native Fish Society*, 992 F. Supp. 2d at 1111.

### B.    *Whether The BiOp Failed to Analyze Effects on Northern Spotted Owls Partially Outside of the Action Area.*

Plaintiffs call attention to the 43 northern spotted owl site centers which have a portion of their home range overlapping the action area but are not analyzed in the

BiOp.  MSJ at 29; BiOp at 111.  No treatments are proposed in those home ranges, and as such, Plaintiffs maintain that the BiOp improperly excludes them from the effects analysis.  MSJ at 29-30.  50 C.F.R. § 402.02 defines "action area" as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action," and states that "effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."

Plaintiffs contend that although treatments are not proposed in those 43 home ranges, the possibility of adverse effects to those home ranges cannot be excluded. Plaintiffs submit that downgrade treatments within the action area, but outside of home ranges, may adversely affect the foraging and dispersal needs of these 43 spotted owl home ranges, asserting that the 2019 wildfires have altered the habitat quality and arrangement across the planning areas and home ranges, thereby affecting spotted owl use of the entire planning area.  Plaintiffs maintain that the effects to the "foraging and dispersal needs" of the 43 spotted owl home ranges is an important aspect of the problem that the BiOp entirely fails to consider.  MSJ at 30. Plaintiffs also point out that the original determination that the proposed action would have "no effect" came from BLM and that FWS recited this in the BiOp.  Pls. Resp. at 15, ECF No. 20.

Defendants point out that Plaintiffs "do not dispute that the portions of the 43 home ranges that overlap with the action area will be untouched by any project activity."  Cross-Mot. at 33.  Nor do Plaintiffs dispute that the core areas for the

spotted owls are not encompassed within the action area. *Id.* "Put simply, without any habitat modification, there is no effect to the owls' use of this habitat for foraging." Cross-Mot. at 33. Defendants assert that Plaintiffs' argument concerning foraging is not based on scientific evidence, highlighting the analysis in the BiOp explaining that spotted owls forage in "central areas" closer to their nest site at a "disproportionate rate." Cross-Mot. at 33; BiOp at 54-55.

With respect to Plaintiffs' contention that the BiOp failed to consider dispersal needs of the 43 spotted owl home ranges, Defendants maintain that the BiOp specifically analyzed the issue based on consideration of the best available science. Cross-Mot. at 33.

Reviewing the BiOp, it explains that spotted owls live year-round in concentrated areas of suitable habitat. BiOp at 7-8. These habitat areas are generally described as a series of three concentric circles which the owl uses for various aspects of its life history. *Id.* The largest circle is called the owl's "home range," within the home range is the "core-use" area, and within the core-use area is the "nest patch." *Id.* The BiOp defines an "action area" as "all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action." BiOp at 39 (citing 50 CFR 402.02). It continues: "For northern spotted owls, the Action Area is usually based on the radius of a circle that would capture the provincial home range, which is 1.3 miles for the Klamath Mountains Province." BiOp at 39 (internal citations omitted). The Evans Creek and Poor Windy projects are in the Klamath Province and thus, the action area represents

"all lands within 1.3 miles of proposed treatment units and all lands within any overlapped associated provincial home ranges of known spotted sites that could be directly, indirectly or cumulatively impacted by the proposed action." BiOp at 39.

With respect to the 43 home ranges that overlap the action area, the BiOp states that "no treatments are proposed within these home ranges," thus FWS concluded that "no effects are anticipated to spotted owls associated with these 43 home ranges." BiOp at 43. The BiOp also provides analysis that foraging primarily occurs near nests:

> "***Spotted owls are central place foraging animals in that areas closer to the nest site receive disproportionally greater use***. Resources such as food and breeding and resting sites can be patchily distributed in heterogeneous landscapes [like that in this case]. . . In such landscapes, animals are likely to disproportionately use areas that contain relatively high densities of important resources . . . with concentrated use close to their nests. These disproportionately used areas are referred to as "core areas." . . . [Research shows] ***that areas of suitable habitat within 0.7 miles (986 acres) of spotted owl activity centers were important to spotted owl life history functions, and that the amount of suitable habitat around nest sites was significantly greater than the amount of suitable spotted owl habitat in random circles***. [Other studies] found similar results for spotted owls in southwest Oregon in that the probability of stand use decreased with increasing distances from the nest area.

BiOp at 54-55 (emphasis added, citations omitted).

Review of the BiOp shows that FWS relied on what the agency considers to be the prevailing scientific approach to define the action area to include "all lands within 1.3 miles of proposed treatment units and all lands within any associated provincial home ranges of known spotted [owl] sites that could be directly, indirectly or cumulatively affected by the proposed action." BiOp at 39. Using that methodology,

if a spotted owl's home range (a 1.3-mile radius around the site center) overlaps at all with a project unit, FWS included it in the "action area" even where the owl's core site center is located outside of the action area.  Plaintiffs do not dispute that, while there are 43 home ranges that partially overlap with the project's defined action area, none overlap with any actual project activity.  *Id.*

Given that there are no projects proposed in the 43 home range areas, the Court cannot conclude that the determination to exclude those home ranges from the analysis of the effects of the project was arbitrary or capricious.  Plaintiffs have not demonstrated that "a proposed project will cause jeopardy" under these circumstances.  See *Native Fish Soc.* 992 F. Supp. 2d at 1111.

Further, noted above, the ESA and its implementing regulations delineate that the Section 7 consultation process to determine the biological impacts of a proposed action under 16 U.S.C. § 1536 starts with two possible roads: whether the proposed action will have "no effect" or if it "may affect" listed species or critical habitat.  If a listed species is outside the proposed "[a]ction area"—that is, it will not be "affected directly or indirectly by the Federal action," 50 C.F.R. § 402.02—it will, by definition, not be affected by the proposed action and consultation is not required.  Similarly, if the action agency—here, BLM—finds "that its action will have no effect on listed species or critical habitat" even within the "action area," it need not consult with the expert agencies—here, FWS.  *See Nat'l Fam. Farm Coal. v. U.S. Env't Prot.* Agency, 966 F.3d 893, 922 (9th Cir. 2020) (stating those principles).

###### C.    Whether the BiOp failed to analyze effects on northern spotted owls outside of known home ranges.

Plaintiffs call attention to the statement in the BiOp that northern spotted owls outside of known home ranges are called "floater" owls, and that such owls are "critically important to maintaining overall population viability." MSJ at 30. *See* BiOp at 138 ("Floaters have special significance in spotted owl populations because they may buffer the territorial population from decline."). Plaintiffs assert that floater owls have been located in at least "two locations" in the Poor Windy action area. MSJ at 30. According to Plaintiffs, FWS failed to analyze how the timber sales will affect floater owls or their habitat. MSJ at 31. Plaintiffs point out that the BiOp analyzes effects within known home ranges only, "despite the fact that 2,533 acres of NRF habitat proposed for logging outside the known home ranges may be occupied by floater owls." MSJ at 31; BiOp at 70.

Defendants respond that FWS determined that BLM retained sufficient habitat quality in the action area, including dispersal habitat, to support floater owls that disperse among and between known owl territories. Cross-Mot. at 36. With respect to floaters that take up residency in previously unoccupied territories, Defendants contend that BLM's "spot check" surveys before project implementation are designed to detect them and allow BLM to modify the action area as needed to avoid take. *Id*. Accordingly, Defendants maintain that FWS exercised its scientific expertise and fully considered the effects to floaters, and the Court should defer to the agency's considered judgment.

To that, Plaintiffs responded that "the BiOp's discussion of effects to dispersal

habitat was limited to 'the transience phase of dispersal'" and did not sufficiently address "floaters in the colonization phase," Pls. Resp. at 18, a contention with which Defendants disagree.

The BiOp relates evidence that most spotted owls are territorial, yet home ranges of adjacent pairs can "overlap," suggesting that the area defended is smaller than the area used for foraging. BiOp at 138. Territorial defense is "primarily effected by hooting, barking and whistle type calls." BiOp at 138. FWS notes: "Some spotted owls are not territorial but either remain as residents within the territory of a pair or move among territories," and that these birds are referred to as "floaters." BiOp at 138. As Plaintiff notes, the BiOp states "Floaters have special significance in spotted owl populations because they may buffer the territorial population from decline," but that "[l]ittle is known about floaters other than that they exist and typically do not respond to calls as vigorously as territorial birds."

While Plaintiffs argue that there were two "floaters" located within the Poor Windy project area, the BiOp describes two documented instances in which responses to surveys could not be confirmed as "resident owls" per the accepted protocol, and the BiOp thus hypothesizes on possible explanations for the inability to confirm residency:

> Spotted owl protocol surveys to all NRF outside of known home ranges are ongoing and if new resident spotted owls are found, the District plans to drop units or modify proposed prescriptions to avoid and minimize or avoid adverse effects and avoid incidental take. To date, no spotted owls have been observed outside of known home ranges in the Evans Creek Project. There are two locations in the Poor Windy Action Area with spotted owl observations outside of historic home ranges. One area could be an alternate location to site #09 17B because the

previously banded birds were observed in this new location. This location is within the KSA and will continue to receive annual surveys for further determination of occupancy in relation to proposed treatments. The second location is just outside of the home ranges of sites #09410 and #13090. There was only one auditory of a female on one visit and an unknown strix species a month earlier. Despite repeated surveys, there were not enough observations to qualify as a resident spotted owl per the protocol. As indicated above, surveys in these project areas will continue and if resident spotted owls are located, the units will be dropped or modified to minimize or avoid adverse effects that lead to a determination of harm.

BiOp at 89.

Further, FWS analyzed impacts to both "dispersal-only" habitat (accommodating for "transience phase" floaters) and "NRF" habitat (accommodating for "colonization phase" floaters). *See*, e.g., BiOp at 63 (analyzing "Effects to NRF and Dispersal-Only Habitat Due to Modify Prescriptions"); *Id.* at 64 (analyzing "Effects Due to Removal of Spotted Owl Dispersal Quality Habitat. In its analysis, FWS determined that over 97% of NRF habitat in the Evans Creek action area would remain unaffected and over 91% of NRF habitat in the Poor Windy action area would remain unaffected. BiOp at 62 (Table 12). With respect to both NRF and dispersal-only habitat, FWS concluded that "post-treatment conditions of the Evans Creek and Poor Windy action areas are likely to continue to support functional dispersal habitat for spotted owls," encompassing the needs of both transience phase and colonization phase dispersers." BiOp at 65.

On this record, the Court cannot conclude that the BiOp fails to consider an important aspect of the problem Plaintiff identifies. The BiOp notes that there is little information available concerning "floaters," and, contrary to Plaintiffs'

contention, FWS expressly assessed the effects of the proposed action on habitat outside of known owl home ranges, including the dispersal habitat, dispersal-only habitat, capable habitat, NRF habitat. *See* BiOp at 100-102 (summarizing effects of proposed action on various habitat classifications). The record shows that FWS exercised its scientific expertise and fully considered the projects' effects to transient "floater" owls.

## II.    Whether the BiOp Unlawfully Relies on Measures That Are Not Reasonably Certain to Occur

Plaintiffs contend that, in concluding that the Poor Windy and Evans Creek timber sales are "not likely to jeopardize" the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat, the BiOp relied on "future development of spotted owl habitat and management of barred owls in the [Late Successional Reserve]" land use allocation to "provide for territories that will support future spotted owl populations." MSJ at 32; BiOp at 63, 67, 101, 105.

Plaintiffs point out, and Defendants do not dispute, that the current barred owl control program is only experimental, is not occurring in the action area, continued federal appropriations for it are uncertain, and it is unknown when or even if a permanent program will be operational in the region. *Id.* Further, that a permanent barred owl control program is also dependent on future appropriations, and on state and federal permits to "take" barred owls, which may not be granted. *Id.*

Before turning to the merits of Plaintiffs' argument, as an initial matter,

Defendants assert that Plaintiffs' claim is "barred by the doctrine of claim preclusion" because it is an improper attempt to relitigate a prior challenge to the 2016 Southwestern Oregon RMP ("the RMP"). Cross-Mot. at 18. Defendants argue that Plaintiffs' allegations concerning the uncertainty of the barred owl control program pertain to "mandatory management directives" in the RMP implemented in BLMs 2019 Projects. Specifically, Defendants contend that the BiOp addresses the RMP management directive prohibiting BLM from authorizing timber sales "that would cause the incidental take of northern spotted owl. . . until implementation of a barred owl management program . . . has begun." Cross-Mot. at 18; BiOp at 17, 159, 160. In Defendant's view, Plaintiffs' challenge the to the BiOp is "actually a challenge to the management directions and land use allocation framework established in the RMP." Cross-Mot. at 18.

## A.   *Claim Preclusion*

The doctrine of claim preclusion bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action." *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997). Claim preclusion only applies when there is "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between the parties." *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (internal citations omitted). "The central criterion in determining whether there is an identity of claims between the first and second adjudications is whether the two suits arise out of the same transactional nucleus of facts." *Owens v. Kaiser Found. Health Plan, Inc*., 24 F.3d 708, 714 (9th

Cir. 2001) (internal citations omitted).

Here, there is a lack of identity of claims between the 2017 challenge to the BLM's 2016 RMPs—brought by some of the Plaintiffs in this case—and the present challenge to the 2019 BiOp, because there are two separate and distinct "transactional nucleus of facts" involved. Specifically, at issue in the 2017 challenge was BLM's decision to revise its RMPs, memorialized in a "Record of Decision," and biological opinions prepared by FWS and NMFS pertaining to the 2016 RMP. *See Pac. Rivers Council v. BLM*, 6:16-cv-01598-TC (D. Or.) (First Amended Complaint, ECF No. 32). In that case, Pacific Rivers argued that the 2016 RMP violated the Oregon and California Lands Act and NEPA. *Id.* at ¶¶ 105–38. Pacific Rivers did not prevail in that challenge. 2019 WL 1232835 (D. Or. 2019), *aff'd, Pac. Rivers Council v. BLM*, 815 F. App'x 107 (9th Cir. 2020).

In the present litigation, Plaintiffs challenge a BiOp issued by FWS for the Poor Windy and Evans Creek timber sales—site-specific projects not in existence at the time of the 2016 RMP. The two lawsuits do not share a common set of facts, a common "transaction," or even a common final agency action. That BLM must comply with its RMP when it issues site-specific projects implementing that RMP does not somehow transform Plaintiffs' challenge to the biological opinion for those site-specific projects into an impermissible attack on the overarching land management plan and its biological opinions, and the government cites no authority for this proposition. Accordingly, the Court finds that the two lawsuits do not share a common set of facts, a common "transaction," or a common final agency action and

Plaintiffs are not precluded from bringing this claim.

### B.    *Merits*

Plaintiffs' claim that FWS unlawfully relied on measures not reasonably certain to occur—namely, the future development of spotted owl habitat and management of barred owls in the Late-Successional Reserve ("LSR") land use allocation.  MSJ at 32.  Plaintiffs call attention to the "experimental" nature of the current barred owl program and assert that the program is "not occurring in the Poor Windy and Evans Creek project areas."  MSJ at 33.  Plaintiffs also argue that "[i]n light of climate change[5] and the increasing occurrence and intensity of wildfire throughout southwestern Oregon, the future development of spotted owl habitat in the LSR is not reasonably certain to occur."  MSJ at 33.

Defendants contend that Plaintiffs improperly rely on cases involving an agency's effort to mitigate the project's effects, and that BLM's commitments to avoid incidental take of spotted owls "until a barred owl management plan is implemented" and to reserve certain areas from commercial timber harvest to help protect and develop habitat that spotted owls prefer are *not* relied on to "mitigate" the project's impacts, and "[r]ather, are current and fundamental parts of the proposed action itself."  Cross Mot. at 22.

When determining whether the action is unlikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, the measures on which a BiOp relies must constitute a "clear, definite

---

[5]     Plaintiffs do not develop any argument concerning "climate change" and "wildfires" and Defendants do not address it.  Therefore, the Court will not analyze that issue.

commitment of resources," and be "under agency control or otherwise reasonably certain to occur." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 & n.17 (9th Cir. 2008)).   "A 'sincere general commitment to future improvements'—without more specificity—is insufficient." *Id.* (*quoting Nat'l Wildlife Fed'n*, 524 F.3d at 935–36).   Rather, "[t]he measures 'must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards.'"   *Id.* (quoting *Ctr. for Bio. Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)).   "Binding mitigation measures cannot refer only to generalized contingencies or gesture at hopeful plans; they must describe, in detail, the action agency's plan to offset the environmental damage caused by the project."   *Id.*

Here, the BiOp concluded that the timber sales are not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat.   BiOp at 110, 114.   In so concluding, the BiOp relied on "future development of spotted owl habitat and management of barred owls in the [Late Successional Reserve]" land use allocation to "provide for territories that will support future spotted owl populations."   BLM AR 00390, 00394, 00432.   But the BiOp highlights the "potential," "ongoing," and "experimental" nature of current barred owl control efforts:

> The recent best available information strongly indicates that ***barred owl competition may be the most pressing threat*** . . . influencing spotted owls. The potential for management to mitigate the impacts of barred owls may be effective for maintaining occupied northern spotted

owl sites and enabling northern spotted owls to recolonize historic sites that have been occupied by barred owls. ***Preliminary information from an ongoing experimental barred owl removal study*** illustrates how the density of barred owls within known spotted owl territories may be influencing spotted owl success.

BiOp at 36 (emphasis added). Elsewhere, the BiOp discussed benefits of a barred owl removal program, concluding that a barred owl management program would be consistent with the recovery needs of the spotted owl "*if* . . . [FWS] decides such a program would be effective and feasible." (emphasis added).

On this record, Plaintiffs have demonstrated that the FWS in the 2019 BOP relied on measures not reasonably certain to occur in determining that the timber sales are not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat in violation of the ESA's requirement for "clear, definite commitment of resources." *Id.* at 743. Accordingly, Plaintiffs have met their burden to demonstrate that the decision was arbitrary and capricious.

## III.    Whether the BiOp's Determination of No Incidental Take is Arbitrary and Capricious

The Oregon and California Revested Lands Act of 1937, under which BLM manages approximately two million acres of federal land in western Oregon, requires BLM to determine the allowable sale quantity ("ASQ") of timber and to sell that amount of timber annually, or as "much thereof as can be sold at reasonable prices on a normal market." 43 U.S.C. § 2601. FWS states in the BiOp that "[t]he primary objectives of the District's FY19 Batch of Projects are to meet the District ASQ, restore the forest-structural and vegetative conditions to a more natural range, and

reduce fire risk and insect and disease outbreaks, and stand susceptibility to disturbance. These activities will result in adverse effects to spotted owls and their habitats." BiOp at 94. Concerning those adverse effects, FWS determined:

> "Spotted owls at 83 sites are likely to be adversely affected by the proposed action; however, the action will not result of incidental take of spotted owls because of RMP management direction . . ."

> "As analyzed herein, while adverse effects to the spotted owl and spotted owl critical habitat are anticipated, the Service concludes that the District's implementation of the FY19 Batch of Projects are not likely to jeopardize the continued existence of the spotted owl or to destroy or adversely modify critical habitat and as such, are consistent with the Biological Opinion on the RMP."

BiOp at 95.

Plaintiffs contend that in making those determinations, the BiOp fails to explain its rationale for its "zero-take incidental take statement" because the BiOp does not point to what "RMP management direction" it refers or explain why adverse effects on spotted owls and their habitat do not rise to the level of take. MSJ at 36; Pls. Resp. at 34. Plaintiffs maintain that a BiOp must explain its reasoning, "such that the agency's path may be reasonably discerned." *See S. Yuba River Citizens League*, 723 F. Supp. 2d at 1279 (*quoting FCC v. Fox TV Stations, Inc*., 556 U.S. 502 (2009)).

FWS states that, "[f]or significant impairment (harm) to occur" to spotted owls at the 83 sites with adverse effects, "there must be reasonable certainty that resident/territorial spotted owls are likely to occupy the affected sites and biologically respond to altered habitat conditions in a manner that corresponds to the regulatory and statutory definitions of take." *Id*. at 90.

Reviewing the BiOp, FWS states that 83 sites are likely to be "adversely affected" by the proposed action, and that 14 of those sites are currently occupied by resident spotted owls but concludes that there will be "no take of spotted owl." BiOp at 114. The BiOp further explains that "adverse effects at those 83 sites are primarily due to the removal and downgrade of NRF habitat within core-use and/or home ranges." *Id*. at 69. In addition, "many of the sites under the proposed action are currently in habitat limited situations . . . and further reductions in NRF habitat are likely to have negative effects on spotted owl demographic parameters." *Id*. For example, the BiOp explains that "best available information suggests that when less than 40 to 60 percent of the home range is NRF habitat, the likelihood of spotted owl presence is lower and survival and reproduction may be reduced." *Id*. FWS noted that those "central tendency values, along with site-specific conditions and spotted owl occupancy inform a determination of harm." *Id*.

In stark contrast with its zero-take conclusion, FWS stated elsewhere in its analysis that the adverse effects to the spotted owls at the 14 occupied sites constitute a "take," but would not result in harm, stating:

> "The proposed action will result in adverse effects to spotted owls at 14 occupied sites. However, ***the take is not anticipated to result in harm***."

*Id*. at 91.

Defendants respond that FWS does explain its reasoning, noting that FWS rationalizes that there would be "no harm" because "[h]arvest amounts are relatively minor and/or occur at the outer edge of home ranges," "in isolated areas without

connectivity to interior habitat," or "are fuels reduction treatments that will modify habitat thereby retaining habitat function." *Id*. Based on those reasons, FWS concluded that it could not be "reasonably certain that incidental take will occur as informed by best available information." *Id*.

Summarizing the above, FWS concludes that spotted owls "occupy" 14 sites where adverse effects are certain to occur; that the adverse effects include the "removal and downgrade of NRF habitat"; that downgrade and removal of NRF habitat increases the likelihood of reduced "survival and reproduction"; and that "the take is not anticipated to result in harm." Yet, nevertheless, issued a zero-take statement. FWS's "no-incidental take" statement contradicts its own findings, its own definition of harm—site occupancy and reasonable certainty of impaired biological functions—and the statutory definitions of harm stated above in Section I (D). This constitutes error and is therefore arbitrary and capricious under the APA. *See Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 802 (D. Alaska 2021) (where FWS contemplated at least some biologically significant disturbances of species would occur, but quantified non-lethal take of polar bears at zero constituted error and was arbitrary and capricious under the APA).

## IV. Whether Defendants Failed to Reinitiate Formal Consultation in Light of New Information Concerning the 2019 Wildfires.

Plaintiffs assert that under the ESA, the Defendants must reinitiate consultation where discretionary federal involvement or control over the action has been retained or is authorized by law, and new information reveals effects of the

action that may affect listed species in a manner or to an extent not previously considered. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a)(2). As a preliminary matter, Defendants assert that Plaintiffs' claim for failure to reinitiate consultation must be dismissed because Plaintiffs failed to satisfy the ESA's mandatory notice requirement by improperly filing suit only 16 days after providing notice of their intent to sue. 16 U.S.C. § 1540(g)(2)(A). Cross-Mot. at 11.

### A.   *Whether Plaintiffs Satisfied ESA Notice*

Defendants maintain that, while Plaintiffs gave FWS and BLM notice of their "failure to reinitiate consultation" claim and waited 60 days before amending their complaint to assert that claim, they violated the 60-day litigation free window by filing their initial complaint only 16 days after providing notice of their intent to sue. *Id*. at 12. Defendants continue that "[n]otwithstanding the fact that Plaintiffs styled the claims in their original complaint as APA claims (which are not subject to the 60-day notice requirement), Plaintiffs' "original filing violated the 'litigation-free' requirement and thereby invalidated the notice for the ESA claim they added later." *Id*.

Plaintiffs respond that their original three claims challenging the BiOp are not ESA citizen suit claims but rather are properly brought under the APA cause of action alleging violations of the ESA. Pls.' Resp. at 3 (citing *Bennett v. Spear*, 520 U.S. 154, 174 (1997) (explaining that any claim against the expert agency alleging its biological opinion violates the ESA must be brought under the APA cause of action).

On May 27, 2020, Plaintiffs sent FWS and BLM a letter providing "Sixty Day Notice of Intent to Sue to Compel Reinitiation of Formal Consultation." FWS AR 00022. Plaintiffs stated their intent to assert a claim that the agencies were required to reinitiate consultation because the 2019 fires constituted "new information revealing effects of the project that may affect northern spotted owl or its critical habitat in a manner or to an extent not previously considered." FWS AR 00023.

Under 5 U.S.C. §§ 702 and 704, the APA creates a cause of action with a right of judicial review for persons adversely affected by agency action within the meaning of a relevant statute, and narrows this right of judicial review to "final agency action for which there is no other adequate remedy in a court." The ESA notice requirement "extends only to the citizen suit provision" and does not "preclude filing of a complaint alleging non-ESA claims before the 60-day notice period expires." *All. for the Wild Rockies v. U.S. Dept. of Agric.*, 772 F.3d 592, 602–03 (9th Cir. 2014) (emphasis added). Here, Plaintiffs did not improperly raise an ESA claim duplicative of the ESA reinitiation claim for which it noticed the agencies, but rather raised separate and distinct claims challenging the BiOp and requesting different relief than its later-added claim challenging defendants' failure to reinitiate consultation in light of subsequent wildfires. Therefore, Plaintiffs have not violated the 60-day litigation free window required for ESA citizen suit claims, and this Court has jurisdiction to decide Plaintiffs' reinitiation claim against FWS and BLM.

**B.    *Merits***

Under the Endangered Species Act, the BLM and FWS must reinitiate consultation where discretionary federal involvement or control over the action has been retained or is authorized by law, and new information reveals effects of the action that may affect listed species in a manner or to an extent not previously considered.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a)(2); *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008).  Not every "modification of or uncertainty in a complex and lengthy project requires the action agency to stop and reinitiate consultation," *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987), "[h]owever, completely new or unanticipated developments, such as the occurrence of a major forest fire . . . might require the halting of [the project] pending reconsultation and the issuance of a new Biological Opinion," *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1459 (9th Cir. 1992).

In the summer of 2019, the East Evans Creek Fire and Milepost 97 Fire burned a combined 4,831 acres in the planning area just as FWS was completing the consultation process.  BLM AR 00326.  The fires burned spotted owl habitat at varying intensities, converting suitable habitat to unsuitable habitat, reducing canopy closure below 40%, and affecting spotted owl prey habitat.  *See* BLM AR 00147.  In particular, the Milepost 97 Fire burned 4,706 acres of critical habitat.  BLM AR 00034, 00027 (map of fire and critical habitat subunits).  The ability of northern spotted owls to move through this critical habitat bridge is essential for the continued existence of the species.  77 Fed. Reg. 71,931.

In its letter transmitting the BiOp to BLM, FWS stated that "[o]nce the fires have been suppressed, [BLM] and [FWS] will evaluate and record the fire impacts. Depending on the outcome of the evaluation, [BLM] will reinitiate consultation as appropriate." BLM AR 00326. BLM prepared an internal agency memorandum that observed:

> At least one fire has occurred in each of the Evans Creek and Poor Windy Action Areas during the 2019 fire season. The East Evans Creek Fire (125 total acres) was located entirely within the Evans Creek Action Area and 4,706 acres of the Milepost 97 fire (13,094 total acres) was located within the Poor Windy Action Area. This represents new information relevant to the proposed action. The fire severity varied within the Milepost 97 fire which resulted in changes to the spotted owl habitat at the analytical scales evaluated in the consultation (action areas, spotted owl home ranges, 5th field watersheds, and critical habitat sub-units). Fire severity data is not available for the East Evans Creek fire and will not be available in the future because the fire was so small.

BLM AR 00034 (citations omitted).

Defendants maintain that BLM determined that re-initiation of consultation was not necessary because its post-fire review indicated the magnitude of changes due to the fires did not alter any site specific determinations—that is, the fires did not alter the BiOp's determination that the project would have an over impact of "likely to adversely affect" spotted owls. Defendants also assert that BLM will "drop" 234 acres from its planned logging operation. Cross-Mot. at 8. Thus, in Defendants' view, what was considered in the initial consultation is still valid. Cross-Mot. at 15; BLM AR 00039. Defendants contend that the project was always anticipated to have an overall impact of "Likely to Adversely Affect" spotted owls and critical habitat and therefore the need to reinitiate consultation is not triggered because the impact of the

fires, especially given BLM's dropped units, will not result in different or amplified effects.

The Court concludes that reinitiation was required in this case. The standard for reinitiating consultation is not that the overall effects determination (here, likely to adversely affect) remains unchanged. Cross-Mot. at 14–15. Instead, it is whether discretionary federal involvement or control over the action has been retained or is authorized by law, and new information reveals effects of the action that may affect listed species in a manner or to an extent not previously considered. 50 C.F.R. § 402.16(a)(2). Here, the agencies should have considered the wildfire, directly occurring in and around the action area, to be new information, the manner and extent of which the agencies had evaluated in the BiOp, yet generally recognized as a primary threat to spotted owls.

## CONCLUSION

According to the appropriate standards for summary judgment, Plaintiffs have met their burden to show that, as a matter of law, the BiOp failed to analyze effects of habitat downgrade and removal on the competitive relationship between the spotted and barred owls; that the BiOp unlawfully relies on measures that are not reasonably certain to occur given the temporary nature of the barred owl removal program, and that such claim is not precluded; that the BiOp's zero-take incidental take statement is arbitrary in capricious; and that Defendants failed to reinitiate consultation in light of new information concerning wildfires in and around the action area. Defendants proved that their determination to exclude 43 home ranges from

the analysis of the effects of the project was reasonable and that FWS exercised its scientific expertise and fully considered the projects' effects to transient "floater" owls. Accordingly, Plaintiffs' Motion for Summary Judgment is GRANTED in part and DENIED in part, and Defendants' Cross Motion for Summary Judgment is GRANTED in part and DENIED in part, consistent with this Opinion.

IT IS SO ORDERED.

Dated this 30th day of September 2022.


   /s/ Ann Aiken       

Ann Aiken
United States District Judge